UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                              :

ROGER SILVESTRE,                :
                              :

                  Plaintiff,      :      15 Civ. 9425 (KPF) (DCF)
                              :

         v.              :      <u>OPINION AND ORDER</u>
                              :      <u>ADOPTING REPORT AND</u>
MICHAEL CAPRA, Superintendent,    :      <u>RECOMMENDATION</u>
Sing Sing Correctional Facility,    :
                              :

                  Defendant.   :
                              :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>July 27, 2018</u>

KATHERINE POLK FAILLA, District Judge:

      Pending before the Court is the June 25, 2018 Report and

Recommendation from United States Magistrate Judge Debra C. Freeman (the

"Report") recommending that Petitioner Roger Silvestre's petition for *habeas*

*corpus* relief under 28 U.S.C. § 2254 (the "Petition") be dismissed in its entirely.

For the reasons set forth below, the Court finds no error in the Report and

adopts it in its entirety.

## BACKGROUND

      This summary draws its facts from the detailed recitation in the Report,

to which neither party objects. (*See* Report 1-13). Petitioner stood trial in 2009

on charges of second-degree murder, first-degree manslaughter, second-degree

attempted murder, first-degree assault, and second-degree criminal possession

of a firearm. (*Id.* at 2). Petitioner was convicted of the manslaughter charge

only. (*Id.*). On January 26, 2010, Petitioner was sentenced to the maximum

term of 25 years, to be followed by five years of post-release supervision. (*Id.* at

18). At Petitioner's sentencing, there was some discussion about the accuracy of his criminal history, but the sentencing court concluded that even if Petitioner's prior offense had been reduced to a misdemeanor from a felony, it nevertheless had the authority to sentence Petitioner to up to 25 years. (*Id.* at 16). Petitioner appealed his conviction to the Appellate Division, which appeal was denied on June 19, 2014. *See People* v. *Silvestre*, 988 N.Y.S.2d 167 (1st Dep't 2014). On November 24, 2014, the Court of Appeals denied leave to appeal. *See People* v. *Silvestre*, 24 N.Y.3d 1046 (2014).

The Petition in this case raises five grounds for relief: (i) that Petitioner's conviction was based on legally insufficient evidence and violated due process; (ii) that Petitioner was denied a fair trial; (iii) that the trial court erred in allowing the prosecutor to dismiss a misdemeanor charge over a defense objection; (iv) that Petitioner's sentence was excessive; and (v) that Petitioner is actually or legally innocent. (Report 23). The Report found each of these bases to be insufficient. (*Id.* at 32-72).

## DISCUSSION

In reviewing a Magistrate Judge's report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Where, as here, no timely objections have been filed, "a district court need only satisfy itself that there is no clear error on the face of the record." *King* v. *Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8,

2009) (internal quotation marks and citation omitted), *aff'd*, 453 F. App'x 88 (2d Cir. 2011) (summary order). "A party's failure to object to a report and recommendation, after receiving clear notice of the consequences of such a failure, operates as a waiver of the party's right both to object to the report and recommendation and to obtain appellate review." *Grady* v. *Conway*, No. 11 Civ. 7277 (KPF) (FM), 2015 WL 5008463, at *3 (S.D.N.Y. Aug. 24, 2015) (citing *Frank* v. *Johnson*, 968 F.2d 298, 300 (2d Cir. 1992)).

Judge Freeman's Report was issued on June 25, 2018, and objections were due on July 9, 2018. Neither party has objected to the Report. Because the parties have not filed objections, the parties have waived their right to object and to obtain appellate review. Even so, the Court has reviewed the Report and finds that its reasoning is sound and it is grounded in fact and law. Accordingly, the Court finds no clear error and adopts the Report in its entirety.

## CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Freeman's thoughtful and comprehensive Report in full. Accordingly, it is hereby ordered that Petitioner's petition for a writ of *habeas corpus* is DENIED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis*

status is denied for purposes of an appeal. *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

       SO ORDERED.

Dated:      July 27, 2018
              New York, New York

                             KATHERINE POLK FAILLA
                           United States District Judge

*Copies of this Order and the Report Were Sent by First Class Mail to*:
Roger Silvestre
10-A-0614
Sing Sing Correctional Facility
354 Hunter Street
Ossining, New York 10562

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROGER SILVESTRE,

                              Petitioner,

              -against-

MICHAEL CAPRA, Superintendent, Sing Sing
Correctional Facility,

                              Respondent.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/25/18

15cv9425 (KPF) (DF)

**REPORT AND**
**RECOMMENDATION**

## TO THE HONORABLE KATHERINE POLK FAILLA, U.S.D.J.:

*Pro se* petitioner Roger Silvestre ("Petitioner") seeks a writ of habeas corpus pursuant to

28 U.S.C. § 2254, following his conviction in state court, upon a jury verdict, of Manslaughter in

the First Degree, in violation of New York State Penal Law § 125.20(1). (*See* Petition Under

28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody, dated Nov. 23, 2015

("Petition" or "Pet.") (Dkt. 1).) Petitioner is incarcerated at the Sing Sing Correctional Facility

("Sing Sing"), in Ossining, New York (*see* Pet., at 1), where he is serving a sentence of 25 years'

imprisonment, to be followed by five years of supervised release (*id.* ¶ 3).

In this habeas proceeding, Petitioner raises a number of challenges to his conviction and

sentence, largely focused on the alleged lack of reliability of the testimony given at trial by the

only eyewitness to the crime. (Pet. ¶ 13.) Respondent, the Superintendent of Sing Sing, argues

that the Petition should be dismissed on the various grounds that Petitioner's claims are

unexhausted, procedurally barred, not cognizable, and/or without merit. For the reasons set forth

below, I recommend that the Petition be dismissed in its entirety.

## BACKGROUND

### A.  Factual Background

Petitioner and his brother, Elvis Silvestre ("Elvis"), stood trial together in 2009, on charges relating to the death of Francis Johnson ("Johnson") and the wounding of Randolph Harrell ("Harrell") in the early morning hours of July 1, 2006.  Both defendants faced charges, as to Johnson, of second-degree murder and first-degree manslaughter (as a lesser included offense to the murder charge); as to Harrell, of second-degree attempted murder and first-degree assault; and, as to both victims, of second-degree criminal possession of a firearm.[1]  The jury acquitted Elvis of all charges, and convicted Petitioner only of the manslaughter count.

Based on the trial transcript,[2] the events underlying Petitioner's manslaughter conviction may be summarized as follows:

---

[1] As discussed below, an indicted misdemeanor charge of fourth-degree criminal possession of a weapon (specifically referencing a knife) was dismissed prior to the charges being submitted to the jury.  (*See* Background, *infra*, at Section B(1); *see also* Discussion, *infra*, at Section II(B)(3).)

[2] It appears from the Docket of this action that the transcripts of Petitioner's state court proceedings were filed with this Court by Respondent in four volumes, at Dkts. 19, 20, 21, and 22.  Respondent, however, did not file the transcripts electronically, and this Court was unable to locate the hard copies of the transcripts in the Court's file.  So that this Court could review the transcripts in connection with its consideration of Petitioner's habeas claims, the Chambers of the undersigned contacted Respondent's counsel, and requested additional copies; counsel responded by then emailing copies of the transcripts to Chambers.  The emailed material, which consisted of three PDF files, included:  (1) a transcript of a pretrial suppression hearing ("Pretrial Tr."), (2) a transcript of trial *voir dire* proceedings, (3) a transcript of Petitioner's trial ("Trial Tr."), and (4) a transcript of Petitioner's sentencing ("Sentencing Tr.").  Each of these transcripts has consecutively numbered pages, and this Court will cite to those page numbers herein.  Further, so as to make the transcripts available electronically on the Court's Electronic Case Filing ("ECF") system, this Court has undertaken to have the three PDF files, containing these transcripts, uploaded to the Docket, at Dkts. 27, 28, and 29.

1.      **Johnson's Death**

On June 30, 2006, Jennie Jones ("Jones") was living in a sixth-floor apartment at 784 Fox Street, in the Bronx, New York with Johnson, whom she considered to be her husband, even though they were not legally married.  (*See* Trial Tr., at 74-75, 77, 79, 85.)  Jones had three children, two of whom were newborn twins fathered by Johnson.[3]  (*See id.*, at 75, 78.)  Jones testified at trial that one of the twins had just come home from the hospital, and that Harrell[4] (who described himself at trial as having been a "real good friend" of Johnson's (*id.*, at 448)) had stopped by at about 10:00 or 11:00 that night with bottles of wine, to celebrate both the fact that the first twin had come home, and the fact that Johnson, who had been pursuing a rap career, was anticipating the release of an album.  (*See id.*, at 77-78.)

Jones further testified that, at about 1:00 a.m. (*i.e.*, early in the morning of July 1, 2006), after Harrell had left the apartment, she heard loud talking outside, and, when she looked out the apartment window, which faced the street, she saw Harrell arguing and "tussling" with Petitioner.  (*See id.*, at 79 ("like they had hands in their faces or like pulling on each other's shirt"), 86-87.)  Jones also testified that she knew Petitioner, as well as his brother, Elvis, as she had gone to school with them.  (*Id.*, at 76-77.)  Eventually, Harrell came back upstairs to the apartment, and Jones dozed off.  (*Id.*, at 81-82.)  She testified that, when she woke up at around 3:00 a.m. that morning, she heard gunshots.  (*Id.*, at 82, 92-93.)  Neither Harrell nor Johnson were still in the apartment at that time, and when she called Johnson's name, she received no response.  (*Id.*, at 82.)  Finally, she heard someone in the hall calling for Johnson (using his rapper name, "Gangsta").  (*Id.*)  She opened the door and saw Harrell sitting on the stairs,

---

[3] At trial, Jones occasionally referred to Johnson by the nickname "Dad."  (*See id.*, at 77-78.)

[4] Jones referred to Harrell at trial by the nickname "Nature."  (*See id.*, at 78.)

bloody, and she went back into the apartment to call "911." (*Id.*, at 82-83.)  Through her

window, she then saw Harrell being taken to an ambulance, on a stretcher.  (*Id.*, at 83.)

Eventually, she learned that someone else had been shot in the building, and she realized it was

Johnson.  (*Id.*, at 83-84.)

At about 4:30 a.m. on July 1, 2006, Johnson was discovered by police in the lobby of the

building, and he died there, shortly after the police arrived.  (*Id.*, at 100, 103-06.)  He had

apparent cut and gunshot wounds, and there was a pool of blood by his body.  (*Id.*, at 151-52.)

### 2.   Harrell's Testimony at Trial

Harrell was the only eyewitness to the events that led to Johnson's death and his own

injuries, and he implicated both Petitioner and Elvis as the perpetrators of the crimes.  According

to Harrell's trial testimony, both he and Johnson were stabbed by Petitioner and shot by Elvis.

Harrell, however, was not a cooperative witness.  He was compelled by the court to appear at

trial as a material witness, was taken into custody forcibly to be brought to court for the trial, and

gave testimony that was inconsistent and, in many ways, seemed unreliable.

### a.   The Material Witness Hearing

Early in the trial proceedings, the court was notified that the prosecution was having

difficulty locating Harrell.  (*Id.*, at 182-A.)  In light of the prosecution's representations that

Harrell was the only eyewitness to the crimes and that obtaining his testimony was a matter "of

the utmost gravity" (*id.*, at 182-B), the court issued a "material witness" order, authorizing

Harrell's arrest for the purpose of bringing him to court to testify (*see id.*, at 182-D, 395-97).

Eventually, after the prosecution apparently enlisted the assistance of the Probation Department,

Harrell (who was then on probation for a separate matter) was taken into custody when he

reported to his probation officer.  (*See id.*, at 398, 412-13.)  Harrell was then brought to the court

for a material witness hearing, at which the court appointed counsel for him and heard testimony

from Modesto Acevedo ("Acevedo"), a Senior Detective Investigator ("DI") at the Bronx

District Attorney's Office, who had been involved in arresting Harrell on the material witness

warrant.  (*See id.*, at 399-401, 411-21.)

Acevedo testified at the hearing that Harrell had refused to speak with him, his

supervisor, and three other detectives, and that it had eventually required "approximately eight to

ten officers" to take Harrell into custody.  (*Id.*, at 413; *see also id.* ("We called for back up and

he had to be taken down by, to be handcuffed.  Refused to be handcuffed, threatened us if we put

our hands on him, he would hurt us and he really challenged us.").)  During the hearing itself,

Harrell made several outbursts, at one point saying, "This was three years ago, man.  Give it a

rest.  If you want to do your job, do it right, then put me in jail."  (*Id.*, at 410.)  At other points,

Harrell's interjections in the proceedings seemed to reflect that he was upset that he had been

"set up" to be arrested when he reported to probation (*see id.*, at 412 ("Ya'll set me up to come

here")), and that the telephone calls that apparently had been made by the District Attorney's

Office, in trying to locate him, had caused him to lose his job (*see, e.g.*, *id.*, at 417 ("Ya'll talk

too much, told my job."), 427 ("Nobody is going to give me my fucking job back.")).

Although the court admonished Harrell to remain silent while Acevedo was testifying, so

that Acevedo could be heard, Harrell did not heed that admonition; rather, as described by the

court, Harrell continued, during that testimony, "to keep up a running monologue [that was]

audible to [the court]."  (*Id.*, at 417.)  Ultimately, the court made findings that the People had

"more than met their burden of showing that [Harrell] [had] material information," that he was

"not at all amenable to process," and that it had taken "extraordinary measures to even get him

[to court]."  (*Id.*, at 425.)  The court also found that Harrell "seem[ed] quite determined not to

cooperate" (*id.*, at 426), and that he was "being defiant in the courtroom and trying to bolt" (*id.*, at 427).  Having then been "informed by the sergeant that [Harrell] continued to be combative [and] belligerent to the extent that they [were] recommending that he actually be shackled," the court authorized the use of shackles "to protect them and everybody else."  (*Id.*, at 433-34.)

Also at the hearing, appointed counsel for Harrell indicated that, unless Harrell were granted immunity from prosecution, she would be unwilling to have him testify regarding the fight he had allegedly had with Petitioner, earlier in the night of the shooting/stabbing.  (*Id.*, at 404.)  The People offered that limited immunity, and the court conferred it on Harrell and later informed the jury that it had done so.  (*Id.*, at 440-45; *see also id.*, at 595.)  The court made clear to Harrell, however, that the immunity it was conferring would only cover matters related to "the alleged altercation" that he had with Petitioner on June 30, 2006, "sometime[] between 10 and 11:30 p.m. on Fox Street,"[5] and that he was "not receiving immunity for anything else."  (*Id.*, at 444-45.)

**b.   Harrell's Varying Accounts of the
Events of June 30 and July 1, 2006**

At trial, although Harrell initially testified that he did not remember the events of June 30 and July 1, 2006 (*see id.*, at 453-54), he then went on to give a fairly detailed account of both the fight he had with Petitioner on the night of June 30 (or very early morning of July 1 (*see supra*, at n.5)), and the shooting/stabbing that occurred thereafter.  As to the fight, he testified that he

---

[5] As set out above, Jones testified that she observed Petitioner arguing or fighting with Harrell at approximately 1:00 a.m. on the morning of July 1, 2006 (*see id.*, at 86), but, although Harrell eventually testified that he did not remember what time the fight occurred (*id.*, at 596-97), he described it as having taken place on June 30, not July 1 (*id.*, at 595-96).

6

punched Petitioner[6] in the face and "beat him up."  (*Id.*, at 464-65, 597-98.)  More particularly, Harrell testified that he fought Petitioner because, in Harrell's words, "he [Petitioner] tried to come at me because he was dusted" (*id.*, at 465), although the court sustained Petitioner's counsel's objection to that particular testimony (*id.*).[7]  Harrell further testified that, after his fight with Petitioner, he went upstairs to Johnson's apartment, and that, "moments later [Johnson] was getting threats by Elvis on the phone."  (*Id.*, at 466.)  The court also sustained defense counsel's objections to that testimony as evidence of an uncharged crime, and specifically instructed the jury to disregard it.  (*Id.*, at 466, 474, 480.)

As to the events that followed, later in the morning of July 1, 2006, Harrell testified that he was with Johnson, when he spotted Petitioner "running down the block with a knife.  (*Id.*, at 454-56.)  According to Harrell, Petitioner came into the building at 784 Fox Street, where he tried to attack both Harrell and Johnson with the knife.  (*Id.*, at 457.)  Harrell described seeing Petitioner "[s]winging the knife at [Johnson] like he wanted to really hurt him, I mean, really hurt him like viciously hurt him" (*id.*, at 458), and Johnson "[t]rying to protect, defend himself," by "[t]rying to get hold of the knife" (*id.*; *see also id.*, at 463 ("testifying that Johnson was "[t]rying to grab a hold of the knife," while Petitioner was "[t]rying to attack him with it")).  After that, Harrell testified, there was "gun fire."  (*Id.*, at 458 ("I don't remember anything after the gun fire because it just happened so quickly, so many shots was coming at us."); *see also id.*, at 607 (testifying that the shots occurred after the knife fight).)  At trial, Harrell identified Elvis

---

[6] At trial, Harrell sometimes referred to Petitioner by the nickname "Scrappy" (*see id.*, at 456), and testified that he had known Petitioner since about 2003 (*id.*, at 463).

[7] At trial, Petitioner's counsel did not state the basis for his objection, but Petitioner took the position on appeal that Harrell's reference to Petitioner's being "dusted" was a reference to unlawful drug use, and thus constituted inadmissible evidence of a prior uncharged crime or bad act.  (*See* Discussion, *infra*, at Section II(B)(2)(a).)

as the shooter (*id.*, at 459-60), and testified that both he and Johnson were shot (*id.*, at 461).  He testified that, after being shot, he left Johnson on the floor, and crawled up the stairs to Johnson's apartment, on the sixth floor.  (*Id.*; *see also id.*, at 683)  He testified that he knocked on the door, that he was "on his knees" and "[s]he [presumably Jones] was hysterical at the time because it was so much blood," and that he was eventually taken to a hospital.  (*Id.*, at 462.)

In an effort to undermine this account of events, defense counsel separately introduced, at trial, the testimony of Gary Alfred ("Alfred"),[8] a detective with the New York City Police Department, who had been assigned to investigate the incident in its immediate aftermath.  (*See id.*, at 981-82.)  Alfred testified that, when he first questioned Harrell regarding his knowledge of events, Harrell said that he was not able to give a description of anyone involved in the case.  (*See id.*, at 992.)  In fact, Alfred testified that, when Harrell was initially shown photo arrays that included photographs of Petitioner and Elvis, he told the investigator that he could not identify anyone from those arrays.  (*Id.*, at 993, 997-98.)

In addition, through cross-examination of Harrell, Petitioner's counsel brought out the fact that, when Harrell had testified before a grand jury, in September 2006, about the shooting and stabbing, he described a different sequence of events than the sequence he then described at trial.  (*See id.*, at 608-20.)  According to the excerpts of his grand jury testimony that were read at trial and confirmed to be accurate by the prosecution, Harrell testified, at that time, that he first heard a vehicle drive up to the building, and then, "as soon as [he and Johnson] were entering the lobby of the building, the door came opened [sic] and shots . . . started getting fired."  (*See id.*, at 608-09.)  Harrell further testified before the grand jury that, *after* he and Johnson had been shot,

---

[8] This Court notes that, at one point during the trial, Alfred was erroneously referred to as Gary "Alford."  (*See* Trial Tr. at 149.)

Petitioner proceeded "to run towards [him and Johnson] and [to] start[] swinging a knife at [them]."  (*Id.*, at 616.)  Harrell also told the grand jury that, after being stabbed, Johnson "grabbed the knife from [Petitioner]," but Petitioner "snatched it back . . . and proceeded to take off after that."  (*Id.*, at 619.)

Defense counsel also brought out other inconsistencies between Harrell's trial and grand-jury testimony.  For example, counsel also elicited, on Harrell's cross-examination, that Harrell had testified before the grand jury that there were three people, not two, involved in the attack on him and Johnson.  (*See id.*, at 673-75 ("Q.  You told the Grand Jury three people, correct?  A.  I see that on the paper. . . . Q.  Okay.  So that's what you told the Grand Jury, right?  A.  Yes."), 698 ("Q.  Were there three people there?  A.  No.  Q.  So why would you ever say there were three people?  A.  I don't know.").)  Counsel also highlighted that Harrell had given somewhat confusing testimony before the grand jury as to who, of the two co-defendants, was armed with a knife, and who with a gun.  At one point, Harrell apparently told the grand jury that "Elvis stopped shooting," and, as noted above, that Petitioner then ran towards him and Johnson, swinging a knife" (*id.*, at 616), but Harrell also conceded that, at another point in his grand-jury testimony, he told the grand jury that he had "seen [Petitioner] shooting and Elvis holding a knife" (*id.*, at 617).  In contrast, Harrell maintained at trial only that Petitioner had a knife and Elvis had a gun.  (*Id.*, at 824-25.)

Aspects of Harrell's trial testimony were also shown, at trial, to be inconsistent with other aspects of the record.  For example, as Petitioner's counsel pointed out in summation (*see id.*, at 1105-06), while Harrell testified that he, as well as Johnson, was stabbed by Petitioner (*see id.*, at 684), Harrell's medical records only reflected that he sustained gunshot wounds (*see id.*, at 944-45).  Petitioner's counsel also argued in summation that, while Harrell testified that he had

punched Petitioner in the face earlier that night, the record contained no indication that Petitioner

had sustained any facial injury.  (*See id.*, at 1107-08.)

### c. Harrell's Outbursts at Trial, His Purported Failure To Recall Any Details of His Own Criminal History and Prior Statements, and His Invocation of the Fifth Amendment

Aside from the content of Harrell's testimony, defense counsel also raised issues at trial

regarding Harrell's conduct in the courtroom and his refusal to answer certain questions.

On cross-examination by defense counsel, Harrell acknowledged that he was testifying

pursuant to a material witness order and that he had refused to cooperate with the prosecution.

(*Id.*, at 568-69.)  At times during the trial, his apparent discontent with the process seemed to

become evident.  In particular, during a sidebar conference between the court and counsel,

Harrell made verbal outbursts that led Elvis's counsel to move for a mistrial and both defense

counsel to request that the court at least inquire as to what the jurors may have heard Harrell say

that was not reflected in the record, and to determine if anything the jurors heard affected their

ability to be fair.  (*See id.*, at 467-78.)  The court denied the motion for a mistrial, but agreed to

ask the jurors what they had heard.  (*Id.*, at 478-79.)  As discussed further below (*see* Discussion,

*infra*, at Section II(B)(1)(b)(vi)), the court then did proceed to query the jurors individually, so as

to ensure that the trial had not been tainted (*see generally* Trial Tr., at 480-504).

Harrell also demonstrated a seeming reluctance to testify by stating repeatedly, on cross-

examination, that he did "not remember" virtually anything about his own prior criminal record,

about statements he had previously given to investigators regarding the events of July 1, 2006,

about his testimony before the grand jury, or about any benefit he had received in connection

with that grand-jury testimony.[9]  (*See generally id.*, at 575-94, 608-12, 614-19, 638-55, 660-62, 672-75, 678-80.)  In summation, Petitioner's counsel argued that these "I don't remember" responses – which counsel described Harrell as having given over 100 times, and perhaps as many as 200 times, to questions posed on cross-examination (*see id.*, at 1090-91 (counsel stating that he had stopped counting after he got to 135 such responses)), demonstrated a lack of truthfulness (*see id.*).

Finally, Harrell's trial testimony was marked by an invocation of his Fifth Amendment right not to incriminate himself, with respect to any questions posed to him regarding his conduct at the time of his arrest on the material witness warrant, as well as at the material witness hearing.  (*See id.*, at 571-73, 691.)  The trial court permitted this invocation, over Petitioner's counsel's objection.  (*See id.*, at 573.)[10]

### 3.   Other Evidence Presented at Trial

Apart from the testimony of Jones and Harrell, the prosecution introduced the testimony of several other witnesses at trial, some of whom described the police investigation that was performed in the case and the forensic evidence that was developed.  Of greatest relevance here, Detective Alfred testified that he went to the crime scene and observed Johnson's body there, by a pool of blood (*id.*, at 149-52), and that he also found a trail of blood leading away from the building on Fox Street (*id.*, at 149-53).  According to Alfred, he followed that blood trail south on Fox Street to 156th Street, then east on 156th Street to Southern Boulevard, then south on

---

[9] Harrell acknowledged, on cross-examination, that, in exchange for his grand-jury testimony, the District Attorney's office agreed to dismiss a then-outstanding criminal charge against him.  (*See id*., at 589-94.)

[10] As discussed below, the Appellate Division found this particular objection to be equivocal, and therefore insufficient to preserve the issue for appeal.  (*See* Discussion, *infra*, at Section II(B)(1)(b)(iv).)

Southern Boulevard to the building at 737 Southern Boulevard – which was the building where Petitioner and Elvis were then living with their grandmother, Irma Silvestre.  (*See id*., at 153-55.) Alfred explained that he followed the blood trail into that building, into the elevator, and finally to Apartment 5-D, which was the Silvestre apartment.  (*Id.*, at 154-55.)[11]

Alfred further testified that, upon learning that Petitioner was in Bronx Lebanon Hospital, he went to see him there.  (*Id.*, at 159.)  Alfred testified to observing that Petitioner had injuries, including cuts on his hands.  (*Id.*, at 159-60.)  He also testified to finding that Petitioner had bloody clothing with him that had been placed in a plastic bag (*id.*, at 161); and that he took Petitioner's bagged clothes into custody and vouchered them (*id.*).

Also of particular relevance was the testimony of Sara Philipps ("Philipps"), a criminologist with the Department of Forensic Biology, of the Office of the Chief Medical Examiner, who was deemed an expert at trial in forensic biology and DNA, as well as the statistical evaluation of DNA findings.  (*Id.*, at 827-28, 831.)  In short, Philipps testified that both Johnson's DNA and Petitioner's DNA were found in blood stains on a washcloth found next to Johnson's body, at the crime scene (*see id.*, at 854-55, 861-62); that Petitioner's DNA was found in a blood stain swabbed from the courtyard outside the front entrance to the building where Johnson's body was found (*see id.*, at 856-58, 214-15); and that Johnson's DNA was found, together with Petitioner's own DNA, in blood stains on Petitioner's clothing (specifically, on his T-shirt) that was recovered from the hospital where Petitioner was treated (*see id.*, at 864-67).

Also noteworthy was the testimony of James Gill ("Gill"), a physician with the Office of the Chief Medical Examiner, who conducted an autopsy on Johnson's body and was deemed an

---

[11] Another officer additionally testified that, upon then entering Apartment 5-D pursuant to a search warrant, he found blood inside a bedroom of that apartment.  (*See* Trial Tr., at 309-14.)

expert at trial in forensic pathology.  (*Id.*, at 900, 904, 912.)  Gill opined, to a reasonable degree

of medical certainty, that Johnson's death was caused by a combination of gunshot and stab

wounds (*id.*, at 937-38, 955-56), and further opined that either of those types of wounds, in

Johnsons' case, could be considered independently sufficient to constitute a fatal injury (*see id.*,

at 937-38; *see also id.*, at 913-17 (describing bullet wounds that could have caused fatal

bleeding), 918-22 (describing multiple cut and stab wounds to, *inter alia*, Johnson's face, head,

neck, and abdomen, including stab wounds to the neck that were one to two inches deep, and

were in the same "very blood[-]vessel rich area" of the body as one of the gunshot wounds).  Gill

also testified that cut injuries he observed on Johnson's hand during the autopsy were "consistent

with somebody grabbing at the knife blade" during a stabbing attack, and "pulling [his hand]

across the blade."  (*Id.*, at 930-31.)  At trial, Gill was also shown a photograph of Petitioner's

injured hand, and testified that the photograph showed a "cut wound" on the thumb side of the

index finger, which, according to Gill, was "the classic location for a person holding a knife and

then the knife sliding and cutting the finger."  (*Id.*, at 943-44.)

Neither Petitioner nor Elvis testified on his own behalf at trial.

**B.**     **Procedural History**

**1.**     **Petitioner's Trial and Conviction**

Following jury selection, Petitioner and Elvis's trial commenced on December 15, 2009,

in the Supreme Court of the State of New York, Bronx County, before the Honorable

Megan Tallmer, J.S.C.[12]  (*See* Trial Tr., at 1.)  Although trial proceedings were not held every

day, the trial took a month to complete, with the jury rendering its verdict on January 15, 2010.

---

[12] Prior to trial, the trial court held a pretrial hearing to determine whether certain
evidence should be suppressed at trial.  The outcome of that hearing is not relevant here.

(*Id.*, at 1327, 1364-70.)  The key evidence presented at trial and certain of the trial court's rulings are summarized above, but two other trial rulings should be noted here, as relevant to Petitioner's habeas claims.

The first of these rulings related to the remarks made by the prosecutor in his opening statement.  The prosecutor introduced the case by telling the jury that Johnson was "an aspiring rapper," and that,

> [o]n June 30th, 2006, [he] had a lot going for him, now he had an
> alum coming out, signed by HUNC, . . . Harlem Up and Coming.
> He was going to have an album release party on the very next day,
> July 1st, the day he died.
>
> He also had twins that were born a few weeks before to his wife
> [Jones][,] . . . Denise and Destiny.  One baby was in the hospital
> because of premature difficulties and one was home with [Jones].
> He had a newborn at home, he had an album coming up, and he
> had a baby about to come from the hospital. [Johnson] had
> everything to live for . . . .

(*Id.*, at 17.)  Although neither defense counsel made a contemporaneous objection to those statements, Elvis's counsel took the position, prior to his own opening statement, that the prosecutor's remarks had suggested to the jury that Johnson was "a great guy, and a loving father" (*id.*, at 27), opening the door to defendants' presentation of evidence (1) that a bag of white powder, alleged to be cocaine, was found in the mailbox for the apartment Johnson shared with Jones (*id.*, at 25; *see also id.*, at 2-3), (2) that Johnson had "extensive criminal involvement . . . [and] was wanted at some point for various different murders" (*id.*, at 25), and (3) that "the [rap] album that [Johnson had] just put out . . . basically [was] 22 tracks glorifying violence where he admit[ted] to shooting different people" (*id.*, at 27).

The court disagreed with Elvis's counsel's argument, finding that, by merely describing Johnson's "home life or his career aspirations," the prosecutor had not "opened the door to

anything." (*Id.* at 26-27; *see also id.*, at 28-33.)  The court therefore denied the application (which Petitioner's counsel eventually joined (*see id.*, at 33)) to introduce evidence impugning Johnson's good character, although the court did caution the prosecutor to ask any questions about Johnson's family life and career "very quickly and only in a very factual manner."  (*Id.*, at 32.)  The court also left in place a ruling it had made earlier that, for purposes of impeaching *Jones'* credibility, defense counsel could question her as to whether she had knowledge of the drugs purportedly found in her apartment mailbox (*see id.*, 4-8), but that counsel could not introduce that evidence for the purpose of "besmirch[ing]" Johnson's reputation (*id.*, at 5).[13]

A second ruling by the trial court that is relevant to Petitioner's claims was its decision, at the charging conference, to allow the People to dismiss one of the indicted charges against Petitioner – specifically, a misdemeanor knife-possession charge – prior to its being submitted to the jury.  (*See id.*, at 1029-30.)  The court asked if any party was asking for that charge, and the prosecutor responded, "I'm not asking.  There is no view of the facts."  (*Id.*, at 1029.) Petitioner's counsel, however, responded, "Yes, I request it."  (*Id.*)  The court then stated, to Petitioner's counsel, "I don't think the law prevents the People from dismissing [the charge] at this stage, counsel, and I don't think you could argue it's a lesser included of any indicted count."  (*Id.*, at 1030.)  At that point, the prosecutor made an application to dismiss the charge, and the court granted the application.  (*Id.* (court stating to Petitioner's counsel, "Again, . . . if you think the law is to the contrary, I'll take a look at it.  That's my understanding, the People can dismiss it at any time prior to the submission unless it could be supported as a lesser included offense of a charge, then it doesn't get to be dismissed.").)

---

[13] On cross-examination, Jones denied any awareness that drugs had been found in the apartment mailbox, and, consistent with the trial court's ruling, counsel's inquiry on the point ended there.  (*See id.*, at 86.)

As noted above, Petitioner was convicted of Manslaughter in the First Degree, in violation of New York State Penal Law § 125.20(1), which was submitted to the jury as a lesser included charge to the indicted charge of Murder in the Second Degree.  (*See id.*, at 1230-31, 1366.)  The jury acquitted Petitioner of the murder, attempted murder, and assault charges, and, after the jury indicated that it was unable to reach a unanimous verdict as to Petitioner on the firearms possession count, the People agreed to dismiss that remaining charge.  (*See id.*, at 1366-72.)  The jury acquitted Elvis of all charges.  (*See id.*, at 1365-66.)

### 2.   Petitioner's Sentencing

Petitioner's sentencing was conducted on January 26, 2010, before Justice Tallmer.  (Sentencing Tr., at 1.)  At sentencing, the court adjudicated Petitioner a second felony offender, based on his earlier conviction of Attempted Criminal Sale of a Controlled Substance in the Third Degree.  (Sentencing Tr., at 12-18.)  Although the sentencing record reflects that the court and the parties initially had some uncertainty as to whether the date of Petitioner's prior conviction, as stated in the Second Felony Information, was accurate and as to whether, after Petitioner's completion of a youthful-offender program, that charge was supposed to have been reduced to a misdemeanor, the court resolved that uncertainty by concluding that Petitioner had been convicted of the prior stated felony on February 5, 1998, and that, after participating in a program, he was eventually sentenced on that conviction, as a youthful offender, on January 19, 2001.  (*See id.*, at 15-18.)  In any event, it appears that the court determined that, even if Petitioner were a first-time felony offender, the court would still have the authority to sentence him to up to 25 years in prison.[14]

---

[14] On this point, the sentencing transcript reflects the following:

Before sentencing Petitioner, the court heard argument by counsel, as well as victim statements and a statement by Petitioner.  (*See id.*, at 3-12, 18-24.)  The court then made a statement, summarizing why, in its view, "nothing in [the] case . . . crie[d] out for any kind of leniency or mercy."  (*Id.*, at 24.)  The court noted that "[t]his was a savage stabbing," that was "unnecessary" and "over something incredibly trite."  (*Id.* (noting that Petitioner "had some kind of either verbal or minor physical altercation with another person and came back and savagely stabbed the deceased to death").)  The court also noted that Petitioner was "not a novice to the system," that he "had the benefit of [a youthful offender] adjudication" and of probation, and that he "expresse[d] no remorse."  (*Id.*, at 25.)  The court also remarked on the "overwhelming proof" of Petitioner's guilt, commenting:  "I don't think I've ever presided over a homicide case where

---

> THE COURT:  . . . Counsel, I don't believe there is any genuine factual issue as to his predicate status.  I find him to be a predicate felon. . . .
>
> . . . And I would just note, that in terms of the sentencing scheme, I don't believe, although he's required to be adjudicated a predicate, if he is, the same range for the B-violent is available to the Court.  Isn't that correct, People?
>
> [Prosecutor]:  Yes, your Honor.
>
> THE COURT:  Even if he was a first felony offender, first violent felony offender.

(Sentencing Tr., at 17-18.)  As discussed below (*see* Discussion, *infra*, at Section II(B)(4)), the permissible range for Petitioner's prison sentence for manslaughter was a minimum of eight and a maximum of 25 years, assuming he was properly adjudicated a second felony offender.  If, on the other hand, he was actually a first felony offender, then he could only have been sentenced on the manslaughter conviction to a prison term of a minimum of five years and a maximum of 25 years.  (*See infra*, at n.29.)  In light of this, this Court understands the sentencing court's comments to mean that the same maximum sentence was available, regardless of Petitioner's status.

17

there is literally a trail of blood that leads from the crime scene to the defendant's bedroom.  And of course there is the incredibly damaging and incriminating DNA evidence here."  (*Id.*)

After making these comments, the court sentenced Petitioner to the maximum prison term of 25 years, with five years of post-release supervision.  (*Id.*, at 26.)[15]

###    3.    Direct Appeal

On or about July 8, 2013, Petitioner filed a counseled brief in the Appellate Division, First Department, on direct appeal, raising four claims, the first two of which had sub-parts.

In his first claim, Petitioner asserted that, in light of numerous issues that called the reliability of Harrell's testimony into question, (a) the verdict was against the weight of the evidence, and (b) Petitioner's trial was unfair, under both state law and federal due-process guarantees.  (*See* Declaration of Catherine M. Reno, Esq., in Opposition [to the Petition], dated May 5, 2016 ("Reno Decl.") (Dkt. 16), Ex. 1 (Brief for Defendant-Appellant), at 32-44.)  The issues that Petitioner highlighted in one or both of these sub-claims included:  (1) that Harrell's testimony was shown at trial to be materially inconsistent, (2) that Harrell was brought into court in shackles, (3) that Harrell had received benefits for both his grand jury and trial testimony, (4) that Harrell had allegedly been improperly allowed to invoke the Fifth Amendment, (5) that Harrell allegedly committed perjury at trial, and (6) that Harrell made outbursts during trial.  (*See id.*)

In his second claim, Petitioner asserted that he was deprived of a fair trial under both the state and federal constitutions because (a) Harrell improperly testified about uncharged prior bad acts of both Petitioner and Elvis, and (b) the court precluded the defense from introducing

---

[15] While not relevant here, Petitioner then agreed to plead guilty to a misdemeanor on an unrelated, outstanding gun charge, for which the court sentenced him to one year in prison, which merged into his 25-year sentence for manslaughter.  (*See* Sentencing Tr., at 27-29.)

evidence of Johnson's bad character, after the prosecutor, in his opening statement, purportedly created a "misimpression" of Johnson's good character.  (*Id.*, at 45-53.)

In his third claim, Petitioner asserted that, in violation of state law, as articulated by the New York State Court of Appeals in *People v. Extale*, 18 N.Y.3d 690 (2012), the trial court erred by allowing the prosecutor, over Petitioner's objection, to make the decision to dismiss an indicted misdemeanor charge against Petitioner prior to its submission to the jury, when the decision as to whether to submit that charge to the jury should have been made by the court, in the exercise of its discretion.  (*Id.*, at 54-56.)

Finally, in his fourth claim, Petitioner asserted that his sentence was excessive, in light of his supposedly minimal prior record, the absence of other aggravating factors, and the fact that, in Petitioner's view, the maximum sentence he received appeared to reflect punishment for counts of which he was acquitted.  (*Id.*, at 57-61.)

On June 19, 2014, the Appellate Division affirmed Petitioner's conviction.  *People v. Silvestre*, 988 N.Y.S.2d 167 (1st Dep't 2014).  Several of the details of the Appellate Division's decision are discussed below, in connection with this Court's review of Petitioner's habeas claims, but, in brief, the Appellate Division found as follows:

As to Petitioner's first claim, the Appellate Division held that the verdict was not against the weight of the evidence, *id.* at 170, and that the various issues raised by Petitioner regarding Harrell's testimony and conduct at trial did not warrant disturbing the jury's credibility determination, *id.* at 170-71.

As to Petitioner's second claim, the Appellate Division held that Petitioner's challenge to the fairness of his trial based on Harrell's testimony about both defendants' prior bad acts was unpreserved, and the court declined to review it in the interest of justice.  *See id.* at 171.  In any

event, the Appellate Division held that Petitioner's challenge to Harrell's testimony concerning Petitioner's purported prior drug use lacked merit, as there was "no basis to conclude that the jury understood [Harrell's reference to Petitioner's being "dusted"] to be a drug reference," and as the trial court sustained Petitioner's counsel's general objection to that testimony.  *Id*. Similarly, the Appellate Division rejected, on the merits, Petitioner's challenge to Harrell's testimony concerning Elvis's purported telephone threats to Johnson, given that the trial court instructed the jury to disregard that testimony.  *Id.*  The Appellate Division also rejected Petitioner's claim that he should have been permitted to introduce evidence of Johnson's bad character, finding that "[t]he statements made by the prosecutor which such evidence would have been designed to counter were not intended to vouch for the decedent's good character."  *Id*.

As to Petitioner's third claim, the Appellate Division held that, under *Extale*, the trial court had, in fact, committed error in failing to exercise its discretion in its determination as to whether the indicted misdemeanor charge should have been submitted to the jury.  *Id.* at 169-70. The Appellate Division further found, however, that the error was harmless, as, in light of the "significant evidence tying [Petitioner] to the stabbing of the decedent, . . . there simply [was] no reasonable basis for concluding that the jury would have opted to forego convicting [Petitioner] on a manslaughter charge in favor of convicting him on a weapons possession charge which only alleged intent to use a knife, but not actual use of it."[16]  *Id.* at 170.

As to Petitioner's fourth claim, the Appellate Division simply stated that it "perceive[d] no basis for reducing the sentence."  *Id.* at 172.

---

[16] The Appellate Division also noted that the weapons possession count had been linked to a particular knife recovered across the street from the building lobby where Johnson was killed, and that no forensic evidence was presented at trial to suggest that this was the knife that had been used in the stabbing attack.  *Silvestre*, 988 N.Y.S.2d at 170.

Petitioner then sought leave to appeal the affirmance of his conviction to the New York Court of Appeals, although this Court has not been provided with a copy of his initial leave application (which was apparently dated July 15, 2014), but rather only with a copy of his appellate counsel's supplemental letter, dated August 26, 2014.  (*See* Reno Decl., Ex. 4 (Aug. 26, 2014 letter, referring, at page 1, to earlier application).)

In the August 26, 2014 letter, Petitioner's counsel set out, in detail, the grounds for the requested appeal.  (*See id*.)  In particular, counsel emphasized two of Petitioner's claims – that, at Petitioner's trial, Harrell had improperly invoked his Fifth Amendment right against compelled self-incrimination, and that reversal was required based on the trial court's failure to exercise its discretion in declining to submit an indicted offense to the jury.  (*Id.*, at 8-12.)  In addition, near the close of the letter, counsel requested the Court of Appeal's review of "additional issues raised below," which, counsel stated, had been "addressed in the briefs submitted to the Appellate Division."  (*Id.*, at 13.)  Counsel then provided a bullet-pointed list of those "additional issues," highlighting the factual and legal bases for Petitioner's claims that his due process rights were violated by the trial court's preclusion of evidence regarding Johnson's bad character, that he was denied a fair trial by the improper admission of evidence of his and his co-defendant's prior bad acts, that his due process rights were violate because he was convicted based on perjured testimony by Harrell, that he was denied a fair trial by Harrell's "angry, profane, and inflammatory outbursts in front of the jury," and that his sentence was excessive.  (*Id.*, at 13-14.)

On November 24, 2014, the New York Court of Appeals denied leave to appeal, without opinion.  *People v. Silvestre*, 24 N.Y.3d 1046 (2014).

### 4.   **Petitioner's Federal Habeas Petition**

On November 23, 2015, Petitioner, proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus under 28 U.S.C. § 2254.  (*See* Pet. (Dkt. 1).[17])  Petitioner raises five grounds in

his Petition for habeas relief, the first four of which largely mirror the four claims he raised on

direct appeal.  Specifically, in his habeas Petition, Petitioner claims:

(1)   that his conviction was based on legally insufficient
evidence[18] and violated due process because the only
witness who testified to the circumstances of the crime at
issue, Randolph Harrell ("Harrell"),

    (a)   gave materially inconsistent testimony,

    (b)   was brought into the courtroom in shackles,

    (c)   received benefits for his testimony,

    (d)   was improperly permitted to invoke the Fifth
Amendment as to a portion of his testimony,

    (e)   committed perjury, and

    (f)   made repeated outbursts during trial;

(2)   that he was denied a fair trial because

---

[17] Although the docket of this action reflects that the Petition was filed on December 1,
2015 (*see* Dkt. 1), a *pro se* prisoner's papers are deemed filed when they are handed over to
prison officials for mailing.  *See Houston v. Lack*, 487 U.S. 266, 270 (1988).  Thus, the Court
will deem the Petition to have been filed on November 23, 2015, the date that Petitioner signed
it, certifying that he was mailing a copy to the Court on that date.  (*See* Pet., at 26; *see also
Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).)

[18] In this regard, while Petitioner's first habeas claim largely echoes (and is said by
Petitioner to be based on) his first claim on direct appeal, he has altered the language of the claim
to assert, in this proceeding, that there was legally "insufficient evidence" to support the verdict,
rather than to assert, as he did in the state courts, that the verdict was "against the weight" of the
evidence.  (*Compare* Pet. ¶13 (Ground One) *with* Reno Decl., Ex. 1, at 32-40.)  As discussed
below (*see* Discussion, *infra*, at Section II(B)(1)(a)), a "weight of the evidence" claim is
grounded in state law, whereas a "sufficiency of the evidence" claim is based on federal due-
process protections.

(a)     Harrell testified at trial about uncharged, prior bad
        acts of Petitioner and his co-defendant, and

(b)     the trial court prevented the defense from
        introducing evidence that would have countered the
        prosecutor's alleged portrayal of the deceased
        victim of the crime as a person of good character;

(3)     that the trial court erred by allowing the prosecution to
        make the decision to dismiss a misdemeanor charge over a
        defense objection;

(4)     that his sentence was excessive; and

(5)     that he is "actually, factually and/or legally innocent."

(Pet. ¶ 13.)

On May 5, 2019, Respondent filed a declaration and a memorandum of law in opposition

to the Petition (Reno Decl.; Respondent's Memorandum of Law, dated May 5, 2016 ("Resp.

Mem.") (Dkt. 18)), together with the transcripts of Petitioner's state-court proceedings (Dkts. 19,

20, 21, 22; *but see supra*, at n.2, and Dkts. 27, 28, 29).  On July 6, 2016, Petitioner filed a reply.

(Affirmation in Reply to Respondent's Opposition, dated July 6, 2016 ("Pet. Reply") (Dkt. 25.)

## **DISCUSSION**

## I.     **APPLICABLE LEGAL STANDARDS**

### A.     **Statute of Limitations**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas

petition must be filed within one year of the latest of four dates specified by statute, usually "the

date on which the judgment became final by the conclusion of direct review or the expiration of

the time for seeking such review."[19]  28 U.S.C. § 2244(d)(1)(A); *see also Williams v. Artuz*,

_____

[19] The limitations period may alternatively begin to run on the following dates:  (1) where
the petitioner was prevented from filing an application by state action, the date on which the
impediment is removed; (2) where the right asserted is a newly recognized one made
retroactively applicable, the date on which the constitutional right asserted was initially

237 F.3d 147, 150-51 (2d Cir. 2001) (judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of] time to seek direct review via certiorari").

The limitations period is tolled during the pendency of any "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim." 28 U.S.C. § 2244(d)(2).

### B.      Exhaustion of State Remedies

As a general matter, a federal court may not consider a petition for a writ of habeas corpus unless the petitioner has exhausted the remedies available in the state courts.  28 U.S.C. § 2254(b)(1)(A); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "'opportunity to pass upon and correct' alleged violations of . . . prisoners' federal rights."  *Picard*, 404 U.S. at 275 (quoting *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)).  A petitioner may fairly present a federal claim in several ways, including by citing relevant provisions of the federal Constitution in his appellate brief, *see Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001), or by relying on "pertinent federal cases employing constitutional analysis," *see Mallet v. Miller,* 432 F. Supp. 2d 366, 374 (S.D.N.Y. 2006) (enumerating the ways a petitioner may fairly present his federal claims in state court).

---

recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1)(B)-(D).

Aside from setting out the federal nature of his claims, the petitioner must also, for purposes of the exhaustion requirement, present those claims to "the highest court of the pertinent state." *Chebere v. Phillips*, No. 04cv296 (LAP), 2013 WL 5273796, at *19 (S.D.N.Y. Sept. 18, 2013) (quoting *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994)).  In New York, for a claim that can be raised on direct appeal, a petitioner must first appeal his conviction to the Appellate Division and then seek "further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005).

A federal claim raised initially raised on direct appeal can be abandoned and thus be held unexhausted, where it is not raised again to the highest state court to which an appeal is then available.  *See Galdamez*, 394 F.3d at 74.  If, for example, in his letter seeking leave to appeal to the New York Court of Appeals from the Appellate Division's denial of his claims on direct appeal, a petitioner raises only certain of the claims he raised below, and omits any explicit reference – even a general one – to the remainder, then the omitted claims will not be considered exhausted.  *See Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991); *Ramirez v. Att'y Gen'l of the State of N.Y.*, 280 F.3d 87, 97 (2001); *Jordan v. LaFevre*, 206 F.3d 196, 198-99 (2d Cir. 2000); *Parrish v. Lee*, No. 10cv8708 (KMK), 2015 WL 7302762, at *10 (S.D.N.Y. Nov. 18, 2015); *Morgan v. Lee*, No. 11cv0390 (MAT), 2012 WL 5336167, at *4-5 (W.D.N.Y. Oct. 26, 2012). Similarly, raising a claim to the Court of Appeals purely in state-law terms will generally be insufficient to exhaust a federal claim.  *See LeGrand v. Lee*, No. 13cv05282 (PKC) (KHP), 2016 WL 7468195, at *8-9 (S.D.N.Y. Dec. 28, 2016), *report and recommendation adopted*, 2017 WL 837683 (Mar. 2, 2017) (discussing *Diguglielmo v. Senkowski*, 42 Fed. App'x 492, 495 (2d Cir. 2002) (Summary Order)).

A petitioner, however, need not discuss the bases of all of his claims in detail, in order for the "fair import" of his total application to the Court of Appeals to be a suggestion that he is seeking to raise each of those claims in that court. *Galdamez*, 394 F.3d at 76 (quoting *Grey*, 933 F.2d at 120). It is sufficient for the petitioner to discuss certain claims and then state, unambiguously, that he is also seeking review of all other claims raised to the Appellate Division, *see Jordan*, 206 F.3d at 199 (additional claims, not substantively argued in leave letter, would have been exhausted, had the petitioner "more clearly stated that he was pressing all of the claims raised in the attached brief"); *Parrish*, 2015 WL 7302762, at *9 (a petitioner's emphasis of one claim does not mean that others should be deemed abandoned, "as long as it is made explicit to the Court of Appeals that he intends to press all of them"); *Leiva v. Heath*, No. 10cv3069 (NRB), 2011 WL 2565487, *6 (S.D.N.Y. June 22, 2011) (claims not expressly discussed in petitioner's letter were fairly presented where petitioner attached his Appellate Division briefs to his submission, and "specifically requested that the Court of Appeals 'consider, as well, each of the remaining issues raised in [his] briefs'"). Indeed, it is sufficient, for exhaustion purposes, for a petitioner simply to indicate to the Court of Appeals, without any discussion, that he wishes to raise all claims asserted in his brief below, *see Morgan v. Bennett*, 204 F.3d 360, 370-71 (2d Cir. 2000), or even just to enclose a copy that brief, without discussion, *see Galdamez*, 394 F.3d at 76.

Where a claim has not been exhausted in the state courts, but the petitioner no longer has any available avenue to return to the state courts to exhaust the claim, the habeas court should "deem" the claim exhausted. *See Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Grey*, 933 F.2d at 120-21; *cf*. 28 U.S.C. § 2254(b)(3) ("An applicant shall not be deemed to have exhausted the

remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented.").

C.   **Procedural Default of Federal Habeas Claims**

As a general matter, federal habeas review is not available where a claim has been raised before the state courts, and the last-reasoned decision of the state courts "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

For this Court to determine that the state-law ground on which the state court rested (which may be substantive or procedural) was "truly an independent basis for decision" rather than "merely a passing reference . . . such reliance on state law must be clear from the face of the opinion." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (citing *Coleman*, 501 U.S. at 732; internal quotation marks omitted); *see Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) ("[T]o preclude federal review, the last state court to render judgment must 'clearly and expressly state[] that its judgment rest[ed] on a state procedural bar.'" (alterations in original; citation omitted)).  To be deemed "adequate," the state procedural rule on which the court's decision was based must be a rule that is "firmly established and regularly followed" by the state, *see Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (internal quotation marks and citation omitted), and must not have been "misapplied in [the petitioner's] case in particular," *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (internal quotation marks and citation omitted).

In order to overcome the procedural bar to habeas review that results from a claim's having been decided on an independent and adequate state-law ground, the petitioner must show

both "cause" for the procedural default, and that "prejudice" resulted therefrom.  *See Coleman*, 501 U.S. at 749.

"Cause" for a procedural default is established when "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Ayuso v. Artuz*, No. 99cv12015 (AGS) (JCF), 2001 WL 246437, at *8 (S.D.N.Y. Mar. 7, 2001).  More specifically, a petitioner can show "cause" for a procedural default when (1) "the factual or legal basis for a claim was not reasonably available," (2) "some interference by state officials made compliance [with the procedural rule] impracticable," or (3) "the procedural default is the result of ineffective assistance of counsel."  *Bossett*, 41 F.3d at 829 (internal quotation marks and citations omitted).

As for the "prejudice" prong, while the Supreme Court has not given "precise content" to the term "prejudice," *see Wainwright v. Sykes*, 433 U.S. 72, 91 (1977), it has made clear that a petitioner must show more than "a *possibility* of prejudice," and that the legal errors raised in the petition "worked to [the petitioner's] *actual* and substantial disadvantage," *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).  This is "a significantly higher hurdle than would exist on direct appeal," *id.* at 166, as the degree of prejudice must be sufficient "to overcome society's justified interests in the finality of criminal judgments," *id.* at 175.  Certainly, where a petitioner's claim lacks merit, he cannot demonstrate that his procedural default of the claim has resulted in prejudice sufficient to overcome the procedural bar.  *See McDowell v. Heath*, No. 09cv7887 (RO) (MHD), 2013 WL 2896992, at *25 (S.D.N.Y. June 13, 2013) ("Petitioner also cannot establish actual prejudice because this ineffective-assistance claim has no merit."); *see also Stanley v. Smith*, No. 12cv6362 (AT) (SN), 2014 WL 5039444, at *16 (S.D.N.Y. Sept. 26, 2014) ("[I]f the underlying claim could not prevail, denying an opportunity

to raise that claim is not fundamentally unfair." (citations omitted)); *Grullon v. United States*,
No. 04cv7144 (SAS), 2006 WL 559668, at *7 (S.D.N.Y. Mar. 8, 2006) ("[Petitioner] has not
shown any prejudice because he has failed to demonstrate that his [claim] would succeed on the
merits.").

A defaulted claim may also be reviewed on federal habeas where a "fundamental
miscarriage of justice" would result from the court's failure to review the claim, but to satisfy
this exception to the procedural bar, the petitioner must make a showing of actual innocence.
*See Schlup v. Delo*, 513 U.S. 298, 326-27 (1995); *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir.
2002). "Actual innocence" means "factual innocence, not mere legal insufficiency." *Dunham*,
313 F.3d at 730 (citations omitted). To support an allegation of a fundamental miscarriage of
justice, the petitioner must bring forward "new reliable evidence – whether it be exculpatory
scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not
presented at trial." *Schlup*, 513 U.S. at 324.

As noted above, where a petitioner presents an unexhausted claim, but, under state
procedural law, no longer has any available avenue to pursue the claim in the state courts (as
when, for example, a claim is record-based, but the petitioner failed to raise it in his one
opportunity for direct appeal), the claim should be deemed exhausted for purposes of federal
habeas review. *See Castille*, 489 U.S. at 351; *Grey*, 933 F.2d at 120-21. The state-law
procedural bar that gives rise to the exhaustion, however, "provides an independent and adequate
state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review
of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default."
*Gray v. Netherland*, 518 U.S. 152, 162 (1996) (citations omitted); *see also, e.g.*, *Sweet v.
Bennett*, 353 F.3d 135, 140 (2d Cir. 2003) ("[W]e conclude that [the petitioner's] appellate

counsel unjustifiably failed to argue this ineffective assistance claim on direct appeal despite a

sufficient record . . . .   Accordingly, [the petitioner's] claim is procedurally defaulted for the

purposes of federal habeas review as well.").

### D.   Standard of Review

When this Court reviews a federal constitutional claim that has been adjudicated on the

merits by the state court, the Court must accord substantial deference to the state court's decision

under the standard of review dictated by AEDPA.  *See* 28 U.S.C. § 2254(d); *see also Sellan v.*

*Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means

"a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the

substance of the claim advanced, rather than on a procedural, or other, ground").  The relevant

section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim – (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established [f]ederal law,
> as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d).  In addition, under AEDPA, where not manifestly unreasonable, a state

court's factual findings are presumed correct, and can only be overcome by "clear and

convincing evidence."  28 U.S.C. § 2254(e)(1).

Under AEDPA, a state court decision is "contrary to" clearly established federal law

where the state court either applies a rule that "contradicts the governing law" set forth in

Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a

[Supreme Court] decision" and arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362,

405-06 (2000).  An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).  The state court's decision, however, "must have been more than incorrect or erroneous"; rather, "[t]he state court's application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*, 529 U.S. at 409).  In order to be entitled to habeas relief, the petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Similarly, a state court's factual determinations are not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  Instead, in order to obtain habeas relief on the basis of a state court's "unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), a petitioner must not only show "by clear and convincing evidence" that a factual finding made by the court was incorrect, 28 U.S.C. § 2254(e)(1), but must also demonstrate "that the corresponding factual determination was 'objectively unreasonable' in light of the record before the court," *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003).  A factual determination may be unreasonable if it "cannot reasonably be reconciled" with the evidence presented in the state proceeding.  *Jones v. Murphy*, 694 F.3d 225, 235 (2d Cir. 2012).  These standards are "demanding," even if "not insatiable." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (noting that "[d]eference does not by definition preclude relief" (quoting *Cockrell*, 537 U.S. at 340)).

When this Court proceeds to consider a substantive claim that has not been decided by the state courts on the merits, this Court must consider the claim under a *de novo* standard of review. *See Carvajal v. Artus*, 633 F.3d 95, 111 n.12 (2d Cir. 2011), *cert. denied* 565 U.S. 888; *see also Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007).

## II.   THE PETITION SHOULD BE DISMISSED.

### A.   Timeliness of Petition

As a threshold matter, this Court finds that Petitioner filed his federal habeas Petition within the one-year statute of limitations provided by AEDPA. The Court of Appeals denied Petitioner's request for leave to appeal the Appellate Division's affirmance of his conviction on November 24, 2014. *See People v. Silvestre*, 24 N.Y.3d 1046 (2014). His conviction became final for AEDPA purposes 90 days later, on February 23, 2015. *See Williams*, 237 F.3d at 150; *see also Epps v. Poole*, 687 F.3d 46, 49 (2d Cir. 2012) (noting 90-day period for filing petition for writ of certiorari). Petitioner filed his habeas Petition nine months later, on November 23, 2015 (*see* Pet.; *see also supra* at n.17), well before the one-year limitations period would have expired.

### B.   Petitioner's Habeas Claims

#### 1.   Ground One:  Sufficiency of the Evidence and Due Process Claims, Arising from Harrell's Testimony and Conduct Before the Jury

As noted above, Petitioner's first stated ground for habeas relief includes six separate and interrelated challenges to Harrell's testimony and conduct on the stand. Petitioner contends that the content and nature of Harrell's testimony and the inflammatory nature of his conduct, separately and together, undermined the legal sufficiency of the evidence purportedly supporting

the verdict and/or denied Petitioner his federal due-process rights.  This Court will first address the Petitioner's legal sufficiency claim, and will then turn to his related due-process claims.

### a. <u>Legal Sufficiency of the Evidence</u>

As a preliminary matter, Petitioner did not raise a legal-sufficiency claim on his direct appeal.  Rather, in his brief before the Appellate Division, he raised a legally distinct claim:  that the verdict was against the weight of the evidence.  A "weight of the evidence" claim is based on Section 470.15(5) of the New York Criminal Procedure Law, which permits an appellate court to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence."  In *People v. Bleakley*, 69 N.Y.2d 490 (1987), the New York Court of Appeals noted that attacks on a verdict based on the weight of the evidence are different from those based on the legal sufficiency of the evidence.  Most importantly, for this Court's purposes, while a legal-sufficiency claim is based on federal due-process principles, a "weight of the evidence" claim is grounded purely in state law.  *Id.* at 495.

Federal habeas review is not available where there is simply an error of state law.  *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or laws or treaties of the United States"); *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.") (citations omitted).  Accordingly, any "weight of the evidence" claim that Petitioner raised on his direct appeal would not be cognizable on federal habeas review.  *See, e.g.*, *Lewis v. Lee*, No. 11cv478 (CS) (LMS), 2015 WL 5751396, at *7

(S.D.N.Y. Sept. 29, 2015) (citing *Douglas v. Portuondo*, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002)).

For purposes of this habeas proceeding, Petitioner has reframed the language of the first claim he raised in his brief to the Appellate Division, so as now to assert that his conviction was based on insufficient evidence, rather than being against the weight of the evidence. (*Compare* Reno Decl., Ex. 1, at 32, *with* Pet. ¶ 13 (Ground One).) A "sufficiency of the evidence" claim, unlike a "weight of the evidence" claim, is grounded in the Due Process Clause of the 14th Amendment, which prohibits conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *In re Winship*, 397 U.S. 358, 364 (1970). On this type of claim, a habeas petitioner "bears a heavy burden because the government receives the benefit of having all permissible inferences drawn in its favor." *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (internal quotation and citation omitted). Habeas relief is only warranted where a court finds that, when viewing the evidence most favorably to the prosecution, no rational jury could find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324, (1979). Such an inquiry "does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt,'" *id.* at 318-19 (quoting *Woodby v. Immigration & Naturalization Serv.*, 385 U.S. 276, 282 (1966)); rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *id.* at 319.

In this case, Petitioner's legal-sufficiency claim is unexhausted, as his appellate brief cannot even arguably be read to have raised such a claim. Indeed, in his brief to the Appellate Division, Petitioner *conceded* that he had no viable legal-sufficiency claim, acknowledging, in

the context of his weight-of-the-evidence claim, that "Harrell's testimony rendered the evidence legally sufficient when viewed in the light most favorable to the prosecution."  (Reno Decl., Ex. 1, at 35.)[20]  Moreover, given that a legal-sufficiency claim, by its nature, is record-based, Petitioner could only have raised the claim on his direct appeal.  As he defaulted in his one opportunity to do so, and as no other avenues are now available to him to raise the claim in the state courts, *see, e.g.*, *Walton v. Ricks*, No. 01cv5265 (LMM), 2003 WL 1873607, at *8 (S.D.N.Y. Jan. 31, 2003), the claim should be "deemed exhausted" and thus considered procedurally barred, *see Gray*, 518 U.S. at 162.

Petitioner has also not demonstrated that he can overcome the procedural bar to this Court's review of his legal-sufficiency claim.  He has made no showing of "cause" for his procedural default of this claim in the state court, and thus this Court need not even reach the question of "prejudice."  *See Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).  Nor has Petitioner shown that a "fundamental miscarriage of justice" would result from this Court's failure to review the claim.  Although Petitioner maintains that he is actually innocent (*see* Pet. ¶ 13 (Ground Five)), his argument in this regard only challenges the reliability of the evidence underlying his conviction, and offers no "new reliable evidence" of his innocence, such as exculpatory DNA evidence, a new eyewitness account, new physical evidence, or any other new evidence that could point to his actual innocence.  *See Schlup*, 513 U.S. at 324.  In fact, the only scientific evidence that has been introduced in this case consists of DNA evidence that is *inculpatory* with respect to Petitioner's involvement in Johnson's death, not exculpatory.

---

[20] This belies Petitioner's argument, now raised on reply, that his appellate counsel essentially raised a legal-sufficiency claim on appeal.  (*See* Pet. Reply ¶¶ 13-15.)

In any event, as Petitioner apparently recognized on his direct appeal, any legal-sufficiency claim in this case would be meritless, under the stringent standard of *Jackson*. Petitioner was convicted of a single crime: Manslaughter in the First Degree, in violation of New York Penal Law § 125.20. As relevant here, the elements of that crime are that, "[w]ith intent to cause serious physical injury to another person," one "causes the death of such person or of a third person." N.Y. Penal L. § 125.20(1). Certainly, if the jury had credited Harrell's testimony that he observed Petitioner "swinging [a] knife at [Johnson] like he wanted to really hurt him, . . . like viciously hurt him" (Trial Tr., at 458), and that Petitioner had actually then stabbed Johnson (*see id.*, at 825), then, given Gill's expert testimony that Johnson's death was caused by stab wounds, as well as gunshot wounds (*id.*, at 937), the jury could have found the requisite elements of intent and causation beyond a reasonable doubt.

Furthermore, even if Harrell's testimony could be found incredible as a matter of law, there was substantial circumstantial evidence in the trial record from which a rational juror could have found the elements of the crime to have been sufficiently proven. Specifically, there was testimony that Jones had observed Petitioner fighting with Harrell (Johnson's friend) a few hours before the shooting (*id.*, at 79-80, 448); that Harrell and Johnson were then both shot, and that Johnson, according to an autopsy, was also stabbed (*id.*, at 83-84, 937); that, according to an expert, as noted above, Johnson's death was caused by both gunshot and stab wounds (*id.*, at 937); that a police investigator found a trail of blood leaving the crime scene and that this trail of blood led directly to Petitioner's apartment (*id.*, at 149-53); that Petitioner was then located in the hospital with wounds, including a cut wound to his index finger that, according to an expert, was consistent with the type of sharp injury that can be caused when a person is holding a knife, and the knife slides from his hand (*id.*, at 943-44); that Johnson, upon the autopsy, was found to

have had cut injuries to his palm consistent with having tried to grab a knife (*id.*, at 930-31); that, according to an expert witness, Petitioner's DNA was not only found in blood swabbed from a location right outside the building where Johnson's body was found (*id.*, at 856-58, 214-15), but was also found in blood stains on a washcloth that was next to Johnson's body (*id.*, at 854-55, 861-62); and that Johnson's DNA was found in blood stains on Petitioner's T-shirt, recovered from Petitioner at the hospital (*id.*, at 864-67).

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'"  *Coleman v. Johnson*, 566 U.S. at 655 (citing *Jackson*, 443 U.S. at 319.) Here, with every permissible inference afforded to the prosecution, the above-described circumstantial evidence amply supported the manslaughter verdict that the jury reached in this case.  *See, e.g.*, *Campos v. Senkowski*, No. 91cv3230 (TPG), 1994 WL 330073, at *2  (S.D.N.Y. July 8, 1994) (finding that a rational trier of fact could "surely" have found the petitioner guilty of murder, in light of evidence that the petitioner and victim had a personal relationship and were seen going to the victim's apartment together, that the victim's body was then found in the apartment with stab wounds, and that the petitioner's pants had blood splattered on them); *Besaha v. Rock*, No. 09-CV-3581 (JFB), 2012 U.S. Dist. LEXIS 59364, at *36-39  (E.D.N.Y. Apr. 27, 2012) (finding that murder verdict was supported by "extremely strong evidence," where the victim was found in the home that she had previously shared with the petitioner and to which he still had a key, the petitioner had reportedly made prior threats directed at the victim, and the crime scene included a footprint in blood that "could have" been made by the petitioner's shoe and hair that "could have" been the petitioner's hair).

For all of these reasons, Petitioner's unexhausted legal-sufficiency claim would fail, even on *de novo* review, and the claim should therefore be dismissed.

### b.   Due Process Claim Relating To Harrell's Testimony and Demeanor

To the extent Petitioner is separately claiming, in his first stated ground for habeas relief, that he was deprived of due process by the overall nature of Harrell's testimony and demeanor before the jury, the various due-process issues raised by Petitioner are addressed, in turn, below.

### i.   Inconsistencies in Harrell's Testimony

According to the Petition, liberally construed,[21] Petitioner was denied due process at least in part because, given his inconsistent versions of events, Harrell "was impeached about every material aspect of his testimony."  (Pet ¶ 13 (Ground One).)  This aspect of Petitioner's due-process claim should be found to have been adequately exhausted by Petitioner, but should be dismissed as without merit.

With respect to exhaustion, Petitioner raised in the Appellate Division the issue of the multiple and significant inconsistencies in Harrell's testimony.  (*See* Reno Decl., Ex. 1, at 32 (arguing that "Harrell was irreconcilably inconsistent regarding every material fact").)  Nonetheless, Respondent contends that any due-process claim based on such inconsistencies should be found to be unexhausted, as, in his appellate brief, Petitioner primarily discussed the issue in connection with his claim that the verdict was against the weight of the evidence.  (*See* Reno Decl., Ex. 1, at 33-40; *see also* Resp. Mem., at 13 n.6 (asserting that Petitioner did not raise any federal due-process claim based on this issue).)  This Court disagrees with Respondent, as, in

---

[21] This Court is required to interpret "[t]he complaint of a *pro se* litigant . . . liberally [] in his favor."  *Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

the section of his appellate brief specifically focusing on his due-process claim, Petitioner did assert, in reliance on federal law, that he "was deprived of his right to due process because he was convicted based on the testimony of a witness who perjured himself on the stand by falsely claiming that he did not recall past events *and contradicting himself*."  (Reno Decl., Ex. 1, at 43 (emphasis added).)  Then, in his letter seeking leave to appeal to the Court of Appeals, Petitioner reiterated the same point (*see* Reno Decl., Ex. 4, at 13), thereby fully exhausting the claim.

In its decision affirming Petitioner's conviction, the Appellate Division did not expressly address the question of due process, but, acknowledging that there were "several inconsistencies between Harrell's account of the incident before the grand jury and at trial," the court held that those inconsistencies did "not provide a basis for disturbing the jury's determination crediting his testimony."  *Silvestre*, 988 N.Y.S.2d at 170 (citing *People v. Sanchez*, 278 A.D.2d 174 (1st Dep't 2000), *leave to appeal denied*, 96 N.Y.2d 834 (2001)).  To the extent this may be read as a decision on the merits of Petitioner's due-process claim, it is entitled to deference under AEDPA. In any event, even if Petitioner's claim were reviewed *de novo*, it would fail on the merits.

The Supreme Court has repeatedly made clear that "the Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit."  *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012).  A criminal defendant, for example, must be afforded a fair opportunity to cross-examine adverse witnesses, so as to draw out, for the jury, any inconsistencies in those witnesses' accounts of relevant facts and to highlight any potential for self-interest or bias.  It is then within the province of the jury to assess credibility, and "[o]nly when evidence is so extremely unfair that its admission violates fundamental conceptions of justice," *id.* (internal

quotation marks and citation omitted), as when the evidence is known by the prosecutor to be false (*see* Discussion, *infra*, at Section II(B)(1)(b)(v), regarding the use of perjured testimony), has the Supreme Court "imposed a constraint tied to the Due Process Clause," *Perry*, 565 U.S. at 237 (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)); *see also Brumfield v. Stinson*, 297 F. Supp. 2d 607, 618 (W.D.N.Y. 2003) (noting that "[t]here is no constitutional requirement that a criminal jury resolve evidentiary inconsistencies in a defendant's favor" and citing *United v. Walsh*, 194 F.3d 37, 52 (2d. Cir. 1999) for its holding that it is within the jury's province to resolve evidentiary inconsistencies, including inconsistent testimony, against a defendant).

The fact, here, that Harrell's testimony was marked by inconsistencies did not give rise to a fundamental denial of justice, as the inconsistencies between his grand-jury testimony and his trial testimony, as well as the internal inconsistencies in his testimony on the stand at trial, were laid bare to the jury through vigorous cross-examination, conducted by counsel for both Petitioner and his co-defendant.  During cross-examination, counsel read portions of Harrell's grand jury testimony aloud, and obtained stipulations from the People as to the accuracy of those readings.  (*See, e.g.*, Trial Tr., at 593-94, 608-11, 616-17.)  Not only was Harrell's credibility repeatedly impeached with evidence of his prior inconsistent statements and his contradictions on the stand, but both defense counsel then spent considerable time in their summations laying out all of the discrepancies that Petitioner argues were significant.  (*See* Trial Tr., at 1092-103, 1128-31.)  In no way does Petitioner suggest that the jury was deprived of information necessary to assess Harrell's credibility, and, in fact, it appears that the jury largely, if not entirely, discredited Harrell's testimony, acquitting Elvis of all charges and convicting Petitioner of only one (first-degree manslaughter), which, as outlined above, was separately supported by circumstantial evidence.

In these circumstances, Petitioner has not demonstrated that the inconsistent character of Harrell's testimony rendered his trial fundamentally unfair, and hence violated his due-process rights.

### ii. Harrell's Being Brought Into Court in Shackles

Petitioner also contends that the fairness of his trial was undermined because Harrell "was physically apprehended and brought into court in shackles as a material witness."  (Pet ¶ 13 (Ground One).)  This aspect of Petitioner's due-process claim is unexhausted, as Petitioner, who mentioned the issue only in a point heading in his appellate brief (*see* Reno Decl., Ex. 1, at 32), making no further mention of it in the substantive discussion contained in that brief (*see id.*, at 32-44), then failed to raise it at all in his letter seeking leave to appeal to the Court of Appeals (*see* Reno Decl., Ex. 4).  Further, as the fact that Harrell was in shackles at Petitioner's trial was evident from the record, the claim could only have been raised on direct appeal, and thus the claim should now be deemed exhausted and procedurally barred.  For the same reasons discussed above with respect to Petitioner's legal-sufficiency claim, Petitioner has not shown a basis for overcoming the procedural bar.

In any event, this claim, if reviewed, would be subject to dismissal on the merits.  The Appellate Division did not address the claim, and therefore any review would necessarily be *de novo*.  Nothing in federal case law, however, suggests that the use of shackles, at trial, to restrain a material prosecution witness who has been shown to be uncooperative, resistant to authority, threatening, and at risk of "bolting" is violative of a defendant's federal due-process rights.

The Supreme Court has only commented on the due-process issues that may arise from the restraining of a criminal *defendant* at trial, not a witness.  As placing a defendant in shackles

during trial is "inherently prejudicial" to the defendant, *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986), it is prohibited by the Due Process Clause unless the trial court determines, in a sound exercise of its discretion, that such restraints are justified by an essential state interest, specific to the particular defendant, *Deck v. Missouri*, 544 U.S. 622, 626-29 (2005); *see also Estelle v. Williams*, 425 U.S. 501, 503-05 (1976); *Illinois v. Allen*, 397 U.S. 337, 344 (1970).   One legitimate interest justifying the use of shackles to restrain a defendant at trial is the need to preserve courtroom security.  *See Deck*, 544 U.S. at 32; *Allen*, 397 U.S. at 344; *see also United States v. Zuber*, 118 F.3d 101, 103 (2d Cir. 1997) (holding that the trial court must perform an "independent evaluation" to determine the necessity of restraints).

At least some circuit courts have similarly identified due-process concerns where *defense witnesses* have appeared at trial in restraints.  In this regard, the courts have also endorsed a particularized inquiry, in which security risks may be found sufficient to warrant shackling.  *See, e.g.*, *United States v. Fountain*, 768 F.2d 790, 794 (7th Cir. 1985) (finding defense witnesses' prior history of escapes and violence to justify shackling).  Some courts have also looked to whether the defendant's right to a fair trial has been adequately protected by a jury instruction explaining that the jury was not permitted to draw a negative inference against the defendant or the witness from the use of restraints.  *See, e.g.*, *Rich v. United States*, 261 F.2d 536, 537-38 (4th Cir. 1958) (finding defendant's rights adequately protected by trial court's charge instructing jury to disregard shackles on both the defendant and a witness); *cf. Zuber*, 118 F.3d at 103 (noting that, "[w]here restraints are deemed necessary, the presiding judge must take steps to limit their prejudicial effect" (citation omitted)).  Courts have not fashioned any absolute rule, however, mandating a jury instruction on this issue, especially where none is requested.  *See*

*Wilson v. McCarthy*, 770 F.2d 1482, 1485 (9th Cir. 1985) (stating that "trial courts should retain flexibility in determining whether a jury instruction is appropriate in a given case").

Regardless of this precedent, it would seem that no due-process concerns would typically arise from the presentation of a *prosecution* witness in shackles, *see United States v. Brooks*, 125 F.3d 484, 499 (7th Cir. 1977) ("Even though a defendant has the right for his own witness to appear without physical restraints, the government reminds us that [the witness in question] was the government's witness."), and, in this case, Petitioner has identified no special circumstances to suggest that the use of shackles to restrain Harrell somehow prejudiced Petitioner's defense. In fact, Petitioner's counsel, who sought to discredit Harrell's testimony at trial, brought out the fact that Harrell was in shackles on his cross-examination (*see* Trial Tr., at 568 ("And as you sit here you're in shackles; aren't you?")), and used his summation to portray Harrell to the jury as a "drug-dealing crack dealer who [hung] out on Fox Street selling his poison" (*id.*, at 1088), *emphasizing* to the jury that Harrell was in custody (*id.*, at 1089 ("And you saw that he was in custody.  He was under arrest under a material witness order.  Saw that he was in shackles.  You saw the number of court officers around to secure him in this courtroom.")).[22]  According to Petitioner's counsel, the fact that Harrell was in custody and potentially a security threat was not something that the jury would have needed to disregard in order to ensure Petitioner a fair trial, but rather something the jury could have appropriately factored into what, counsel urged, should have been a negative credibility assessment of this key prosecution witness.  (*See id.*, at 1089-90.)

---

[22] Counsel for Petitioner's co-defendant at trial went even further, and told the jury in summation that "[t]hat guy [Harrell] would have taken a swing at somebody if he wasn't shackled in there like an animal.  Because he d[id]n't know how to behave."  (Trial Tr., at 1134.)

Moreover, the trial court approved the request of law enforcement to bring Harrell to trial in shackles only after hearing sworn testimony (outside the presence of the jury) that Harrell had made physical threats to the officers who had sought to bring him to court on the material witness warrant, and that it had taken eight to 10 officers to bring him under control.  (Trial Tr., at 413.)  The court also made findings that Harrell was then "defiant in the courtroom and tr[ied] to bolt," and that he was "combative" and "belligerent."  (*Id.*, at 427, 433.)  These factual findings are entitled to a presumption of correctness, *see* 28 U.S.C. § 2254(e)(1), which Petitioner has not even attempted to overcome.

Under these circumstances, this Court sees no basis for finding any due process violation arising out of the trial court's decision to authorize the use of restraints to secure Harrell's testimony as a material witness.

### iii.   Harrell's Receipt of Benefits for His Testimony

Petitioner additionally contends that the fact that Harrell "received benefits for his grand jury and trial testimony" made his testimony unreliable.  (Pet ¶ 13 (Ground One).)  To the extent Petitioner makes this contention as part of a due-process claim, it is arguably also unexhausted, deemed exhausted, and procedurally barred.  After initially raising the issue in a point heading of his appellate brief that mentioned due process, Petitioner went on to discuss the issue only in connection with his weight-of-the-evidence claim (*see* Reno Decl., Ex. 1, at 38-39), and then, in his letter seeking leave to appeal to the Court of Appeals, he mentioned the issue only in the factual background section of his letter (*see* Reno Decl., Ex. 4, at 6), rather than in his discussion of the claims as to which leave to appeal was being sought (*see id.*, at 8-14).  Even if this was enough to have exhausted the claim, it should be denied as without merit.

The Appellate Division aptly noted, in its decision, that "Harrell's initial reluctance to cooperate and the subsequent offer by the People to withdraw certain charges against him was thoroughly explored at trial and the jury was entitled to credit Harrell's testimony notwithstanding it." *Silvestre*, 988 N.Y.S.2d at 171.   During Harrell's cross-examination, the jury was made aware that, in exchange for his cooperation in testifying before the grand jury, the prosecutor had promised Harrell that certain misdemeanor charges that were pending against him at the time would be dismissed.  (Trial Tr., at 589-94; *see also id.*, at 1087 (Petitioner's counsel pointing out to the jury, in summation, that Harrell had received that benefit for his grand jury testimony).)  The jury was also made aware that, to secure Harrell's testimony at trial, the prosecution had agreed that the court should grant him immunity from prosecution for his fight with Petitioner in the hours preceding the shooting/stabbing, and that the court had done so.  (*Id.*, at 594-95; *see also id.*, at 595 (court explaining to the jury that it "did confer immunity on [Harrell] . . . with respect to the alleged altercation with [Petitioner]" and further explaining that this meant that Harrell could "not be prosecuted for anything in relation to that alleged incident").)

In short, no information regarding any benefits that Harrell had obtained in connection with his testimony was withheld from the jury, and the jury was thus able to factor that information into its evaluation of Harrell's credibility.  For this reason, there is no basis to find that Petitioner's trial was rendered fundamentally unfair by the mere fact that Harrell had received those benefits.  *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (finding due process violation where jury was not informed that key witness may have received a promise of non-prosecution, and where jury thus could not consider that information in making a credibility determination); *United States v. Koss*, 506 F.2d 1103, 1110-11 (2d Cir. 1974) (fact that witness

had a history of immunity deals and government cooperation did not violate defendant's due

process rights where jury was made fully aware of that history).

### iv.    **Harrell's Invocation of the Fifth Amendment**

Petitioner additionally claims that Harrell "was improperly allowed to invoke the Fifth

Amendment about prior statements at the material witness hearing."  (Pet ¶ 13 (Ground One).)

Petitioner exhausted this claim by raising it to the Appellate Division on due-process grounds

(*see* Reno Decl. Ex. 1, at 41-43), and in his letter seeking leave to appeal to the Court of Appeals

(*see id.*, Ex. 4, at 8-10), but the claim is nonetheless procedurally barred from habeas review and,

even if not barred, the claim is without merit.

With respect to this claim, the Appellate Division held:

> [Petitioner's] argument that his right to a fair trial was . . . violated
> because of Harrell's repeated invocation of the Fifth Amendment
> when asked about a material witness hearing at which he . . .
> engaged in several outbursts, is . . . unpreserved and we decline to
> review it in the interest of justice.  Defense counsel was equivocal
> about whether Harrell was truly not entitled to exercise that right.

*Silvestre*, 988 N.Y.S.2d at 171.  "In any event," the Appellate Division further held, "Harrell

properly invoked the Fifth Amendment because he had reasonable cause to apprehend danger

from a direct answer to questions about his outbursts at the material witness hearing."  *Id.*

(internal quotation marks and citation omitted).

The Appellate Division's first holding – that the claim was unpreserved – stated an

"independent" state-law ground for denying Petitioner's claim, as the court's reliance on the state

preservation requirement was clear from the face of the court's decision.[23]  *Fama*, 235 F.3d at

---

[23] The fact that the state court alternatively addressed the merits of the federal claim does
not obviate the fact that the claim was denied on an independent state-law ground.  *Green v.
Travis*, 414 F.3d 288, 294 (2d Cir. 2005) ("Even where the state court has ruled on the merits of

809.  In addition, the stated ground was "adequate" to support the court's denial of the claim, as the preservation requirement has consistently been accepted as "firmly established and regularly followed" by the New York state courts.  *See, e.g.*, *Richardson v. Greene*, 497 F.3d 212, 219 (2d Cir. 2007).  Further, although Petitioner apparently contends that the Appellate Division misapplied the preservation rule in this instance (*see* Reno Decl., Ex. 4, at 9-10 (arguing, in letter seeking leave to appeal to the Court of Appeals, that trial counsel had sufficiently "registered his objection" to preserve the claim for appeal)), the trial transcript reflects that the Appellate Division's ruling had a sound basis.  When Harrell invoked his Fifth Amendment right at trial, Petitioner's counsel merely stated, "I don't know if he has the right to exercise."  (Trial Tr., at 573.)  At best, this was an ambiguous objection and, thus, under state law, it was insufficient to preserve the issue for appellate review.  *See, e.g.*, *People v. Rogelio*, 79 N.Y.2d 843, 844 (1992) (holding issue unpreserved where defense counsel failed "to make an unambiguous objection" at trial).  Moreover, the court responded by stating, "I think he does, counsel" (Trial Tr., at 573), but then added, "We can discuss it later" (*id.*), and, despite this, Petitioner's counsel did not then re-raise the issue at any later time (*see generally id.*).  In these circumstances, the Appellate Division's determination that Petitioner's claim was unpreserved should not be disturbed, and the claim should be considered procedurally barred.

Yet, even if Petitioner were correct that his counsel's objection at trial was sufficient to preserve his claim that Harrell's invocation of the Fifth Amendment was improper and materially impacted the fairness of Petitioner's trial, this due-process claim would be subject to dismissal on the merits, under AEDPA.  As set out in Respondent's brief (*see* Resp. Mem., at 45-46), the

_____

a federal claim 'in the alternative,' federal habeas review is foreclosed where the state court has also expressly relied on the petitioner's procedural default.").

Supreme Court has held that the Fifth Amendment privilege against self-incrimination extends to witnesses "who have 'reasonable cause to apprehend danger from a direct answer,'" and further "extends not only 'to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant.'"  *Ohio v. Reiner*, 532 U.S. 17, 20-21 (2001) (quoting *Hoffman v. United States*, 341 U.S. 479, 486 (1951)).

Here, the Appellate Division, in its alternate holding, determined that Harrell met the Supreme Court's enunciated test of having had "reasonable cause to apprehend danger from a direct answer" to questions that defense counsel posed regarding Harrell's conduct at the material witness hearing.  *See Silvestre*, 988 N.Y.S.2d at 171.  This was not an unreasonable application of Supreme Court law, *see* 28 U.S.C. § 2254(d), given the context of, and the statements made, at that hearing.  First, the backdrop of the hearing involved Harrell's arrest on the material witness warrant when he reported to his probation officer.  As set out above, a DI testified at the hearing that it had taken eight to 10 officers to place Harrell into custody, after Harrell had resisted and threatened the DI and other law enforcement officers with physical violence.  (*See* Background, *supra*, at Section A(2)(a); *see also* Trial Tr., at 412-13 (testifying that Harrell "[r]efused to be handcuffed, threatened us if we put our hands on him, he would hurt us and he really challenged us").)  In granting Harrell partial immunity in connection with his trial testimony (only with regard to his altercation with Petitioner on the night of the shooting (*id.*, at 444-45)), the trial court made clear that the conferral of immunity would not shield him from prosecution for any possible or attempted assault against the DI (*id.*, at 442).  In these circumstances, Harrell was entitled to invoke the Fifth Amendment to avoid answering questions regarding his conduct at the time of his arrest.

48

Second, as Respondent observed in its opposition, certain of the verbal outbursts made by Harrell at the material witness hearing "would have been relevant to establishing his motive for fighting the officers" who took him into custody.  (Resp. Mem., at 49-50.)  In particular, when the DI testified at the hearing that officers had tried to find Harrell at his former job, but were informed that he had been fired, Harrell asserted, "Ya'll talk too much, told my job.  What's wrong with you?" (*id.*, at 417), suggesting that he may have blamed the arresting officers for the loss of his job (*see also id.*, at 427 (Harrell interjecting, later in the hearing, "Nobody is going to give me my fucking job back").  In addition, when the DI testified that, once Harrell had been contacted by the Probation Department and instructed to report, officers went to Probation to arrest him "as he came in," Harrell twice asserted that he had been "set up" (*id.*, at 412), suggesting another reason why he might have resisted arrest or threatened the officers.  Thus, Harrell could have reasonably perceived that responding to questions about his outbursts at the hearing would "furnish a link in the chain of evidence" needed to prosecute him for his conduct towards the arresting officers, *Reiner*, 532 U.S. at 20-21 (internal quotation marks and citation omitted), again entitling him to invoke his Fifth Amendment rights.

Finally, it would have been reasonable for Harrell to have believed that his conduct at the material witness hearing, itself, could have furnished an independent basis for prosecution.  In this regard, this Court notes that, at the hearing, Harrell repeatedly disregarded the trial court's instructions.  (*See* Trial Tr., at 417 (court noting for the record that, despite its "request or admonition" that Harrell not speak while the DI was testifying, Harrell had "ke[pt] up a running monologue").)  Indeed, the trial court itself described Harrell as having been "defiant in the courtroom" (*id.*, at 427), and stated on the record that Harrell had even "tr[ied] to bolt" from the proceeding (*id.*).  Even apart from his potentially contumacious behavior, Harrell made

49

statements at the hearing that could have been interpreted as implicating him in criminal activity (*see id.*, at 410 ("If you want to do your job, do it right, then put me in jail")), or as making threats (*see id.*, at 421-22 ("Why am I getting – why am I locked up, period" and "All right. Somebody is going to pay . . .").

A trial court "must be permitted to exercise some discretion" in determining the propriety of a witness's invocation of his Fifth Amendment right against self-incrimination, *Mason v. U.S.*, 244 U.S. 362, 366 (1917), and the Supreme Court has cautioned that such discretion should be found to have been abused only where "there has been a distinct denial of a right guaranteed," *id.* In this instance, viewing Harrrell's conduct and statements at the material witness hearing as a whole, the trial court reasonably accepted Harrell's invocation of the Fifth Amendment with respect to any questions posed to him concerning what he "blurted out" at that hearing (Trial Tr., at 572-73), and the Appellate Division then reasonably applied federal law to conclude that the invocation was proper, *Silvestre*, 988 N.Y.S.2d at 171.  As Petitioner has not shown any basis for disturbing the Appellate Division's determination that Harrell was entitled to invoke the Fifth Amendment, Petitioner, by logical extension, cannot prevail on a claim that his due-process rights were violated by that Fifth Amendment invocation.

### v.      Harrell's Alleged Perjury

Petitioner further claims that he was denied a fair trial because Harrell "flagrantly lied on cross-examination."  (Pet. ¶ 13 (Ground One).)  Petitioner fully exhausted this claim on his direct appeal, by raising it, in federal due-process terms, in his Appellate Division brief and then, in identical terms, in his letter seeking leave to appeal to the Court of Appeals.  (*See* Reno Decl., Ex. 1, at 43; *id.*, Ex. 4, at 13.)  Specifically, in his appellate brief, Petitioner argued that he had been convicted "based on the testimony of a witness who perjured himself on the stand by falsely

claiming that he did not recall past events and contradicting himself" (*id.*, Ex.1, at 43), and that, as Harrell's "entire cross-examination was pervaded by his false testimony," due process "required that his entire testimony be stricken" (*id.* (citing federal cases)).  The Appellate Division held that any claim by Petitioner that Harrell's testimony should have been stricken in its entirety was "unpreserved," and the court "decline[d] to review it in the interest of justice, since [Petitioner's] counsel never made such a request [at trial]."  *Silvestre*, 988 N.Y.S.2d at 171. "In any event," the Appellate Division held that, "under the circumstances[,] due process did not require the [trial] court to take the drastic measure of striking the entire testimony of the only testifying eyewitness."  (*Id.*)[24]  In light of these holdings, the claim should be dismissed as procedurally barred and, in any event, as without merit under the deferential AEDPA standard of review.

As to the Appellate Division's ruling that the claim was unpreserved, the record, in fact, does not reflect that Petitioner's counsel ever argued to the trial court that Harrell's testimony should be stricken as perjurious.  The Appellate Division's ruling therefore constituted a proper application of the state's preservation requirement, and provided an independent and adequate state-law ground for its decision, rendering the claim procedurally barred from habeas review. Further, as with his other procedurally barred claims, Petitioner has not demonstrated that he can overcome the procedural bar, as he offers no "cause" for having failed to preserve the claim, and no new evidence of actual innocence.

---

[24] With respect to Harrell's testimony that he could not recall past events, the Appellate Division more specifically found that "Harrell's oft-repeated response that he could not recall the answer to a question was not an impediment to the jury's decision to convict, because those responses primarily went to his criminal past and the benefits he had been offered to testify, but not to the actual events that led to decedent's death."  *Silvestre*, 988 N.Y.S.2d at 170-71.

Yet, even in the absence of a procedural bar, Petitioner could not prevail on a due-process claim based on Harrell's purported perjury.  Under clearly established Supreme Court law, a state conviction violates due process where it is "obtained through use of false evidence, known to be such by representatives of the State."  *Napue*, 360 U.S. at 269.  The Supreme Court has also made clear that a conviction is subject to challenge under the Due Process Clause where evidence of the falsity of the witness testimony on which the verdict was based was not previously disclosed by the prosecution.  *See, e.g.*, *Alcorta v. Texas*, 356 U.S. 28, 29-32 (1957) (due process violated where only eyewitness to killing issued a sworn statement, subsequent to the trial, declaring that, with the prosecutor's knowledge, he had testified falsely, and where the petitioner alleged that he had no knowledge of the falsity at the time of trial); *see also Pyle v. Kansas*, 317 U.S. 213, 216 (1942) (allegations sufficient to charge a deprivation of due process where petitioner asserted "that his imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him"); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (due process violated where defendant is deprived of liberty "through a deliberate deception of court and jury by the presentation of testimony known to be perjured").

The Supreme Court has not held, however, that due process is violated merely because a prosecution witness gives testimony that appears to be unreliable *on its face*, either because of blatant inconsistencies in that testimony or because the witness refuses to admit knowledge of matters that logically should have been known to him.  In this case, the only evidence of "perjury" that Petitioner puts forward are the self-evident inconsistencies in Harrell's testimony, as discussed above, coupled with Harrell's purported failure to "recall" virtually any information regarding his criminal history and prior testimony.  (*See* Reno Decl., Ex.1, at 43.)  Petitioner

offers no evidence that the prosecution withheld any information about Harrell's testimony from Petitioner or from the jury; to the contrary, there is no dispute that the questionable aspects of that testimony were all on plain view before the jury, which was just as capable of making an evaluation of Harrell's truthfulness as Petitioner or this Court.

To the extent Harrell's testimony was patently false, the jury was free to disregard it, in whole or in part.  Indeed, as already noted, it appears likely that the jury did just that.  On summation, Petitioner's counsel laid out all of the reasons (the same reasons being advanced here) why the jury should consider Harrell's testimony to be unworthy of belief (*see* Trial Tr., at 1084-115), and, in addition to acquitting Elvis on all charges, the jury proceeded to convict Petitioner of manslaughter only – a conviction which, as discussed above, was well supported by evidence in the record other than Harrell's testimony.  For all these reasons, this Court cannot conclude that the jury's verdict against Petitioner rested on perjured testimony, or that the falsity of any aspect of Harrell's testimony was known to the prosecution and not disclosed prior to or at the trial, such that Petitioner's trial should be viewed as having been fundamentally unfair.  Likewise, this Court cannot conclude that the Appellate Division's decision that due process did not require the striking of Harrell's testimony in its entirety was contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d).

### vi.    Harrell's Outbursts During Trial

Finally, with respect to his first-stated ground for habeas relief, Petitioner contends that Harrell's "repeated outbursts during trial" deprived him of his right to a fair trial.  (Pet ¶ 13 (Ground One).)  In particular, Petitioner appears to be referencing the outbursts made by Harrell during the sidebar conference conducted by the trial court, after Harrell testified that Elvis had made threats to Johnson by phone.  (*See* Reno Decl., Ex. 1, at 40-41; Trial Tr., at 466-71.)  On

direct appeal, Petitioner raised this claim, in federal due-process terms, in his brief to the

Appellate Division (*see* Reno Decl., Ex.1, at 40-41), but the Appellate Division rejected the

claim on the ground that it was unpreserved, *Silvestre*, 988 N.Y.S.2d at 171 (finding that

Petitioner's counsel "did not join in the codefendant's motion for a mistrial after Harrell

allegedly made hostile statements to the jury," and "declin[ing] to review this unpreserved claim

in the interest of justice").  As an alternate holding, the Appellate Division also found the claim

to be without merit, noting that the trial court had not only "instructed the jury to disregard the

testimony concerning a threat," but had "polled the jurors concerning that testimony and also

about the outburst, and each juror [had] responded that he or she could remain impartial."  *Id.*  In

his letter seeking leave to the Court of Appeals, Petitioner raised the claim again, thereby

exhausting it for habeas review.  (*See* Reno Decl., Ex. 4, at 13.)[25]

　　　　As to the Appellate Division's first holding (that the claim was unpreserved), this Court

has reviewed the trial transcript, which reveals that, as stated by the Appellate Division,

Petitioner's counsel did not join in the motion by Elvis's counsel for a mistrial based on Harrell's

outbursts.  (*See* Trial Tr., at 470.)  In fact, Petitioner's counsel made no objection to Harrell's

---

[25] In his letter to the Court of Appeals, Petitioner cited only state cases as authority for
this claim, and, although he referred to a denial of "due process" and a "fair trial," this Court is
cognizant that there may be instances when an appellant's use of these phrases alone may be
insufficient to alert the state court to the federal constitutional nature of the claim being asserted.
*See Petrucelli v. Coombe*, 735 F.2d 684, 688 (2d Cir. 1984) (noting that "'[d]ue process,' like
'fair trial,' can be a catchphrase used by habeas petitioners as part of  an allegation about any
type of trial court error, including errors in rulings based on state law").  Nonetheless, this Court
finds that Petitioner's summary of the claim in his letter (including the statement that "Harrell's
angry, profane, and inflammatory outbursts in front of the jury deprived [Petitioner] of his
constitutional rights to due process and a fair trial") may fairly be read to have invoked federal
constitutional guarantees.  Further, that summary mirrored the argument Petitioner made in his
appellate brief, in which he specifically cited the Fifth and 14th Amendments.  (*See* Reno Decl.,
Ex. 1, at 40-41.)  In these circumstances, this Court finds that Petitioner sufficiently apprised the
Court of Appeals of the federal nature of the claim, for purposes of the exhaustion requirement.

conduct at that time, except to join in a request by Elvis's counsel that the court inquire of the jurors as to what they heard Harrell say, and as to whether it had "an effect on their ability to be fair." (*Id*., at 478.)  The court granted that request, first instructing the jury as a whole to disregard "anything that [it] might have heard or saw from [Harrell]," and then, as mentioned above, questioning each juror individually as to what he or she may have overheard.  (*See id*., at 480-504.)  After the court completed that process, Petitioner's counsel made no further objection. (*See id.*, at 504 *et seq.*)  Thus, the Appellate Division's denial of Petitioner's claim for lack of preservation rested on a state-law ground that was not only independent of the federal issue, but also adequate to support the decision, giving rise to a procedural bar to this Court's review of the claim.

Once again, Petitioner has not shown that he can overcome the procedural bar, and, once again, the claim would be subject to dismissal on the merits, even if it were not barred.  There is simply no evidence in the record that Harrell's outbursts rendered Petitioner's trial unfair, in light of the trial court's instruction to the jury that Harrell's words and conduct associated with the outbursts be disregarded, and the court's individualized inquiry to every juror, to ensure that each was unaffected by the outbursts and could remain impartial.  A jury is generally presumed to follow a trial court's instructions.  *See Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, . . . and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." (citations omitted)).  In this instance, there is *no* reason to believe that the jury could not follow the court's instruction to disregard Harrell's outburst, and, further, *no* likelihood that they heard him say anything that could have been

devastating to Petitioner's defense.  Of the 12 jurors who ultimately rendered the verdict in

Petitioner's case, only one reported hearing anything that Harrell said during his outburst, and

that juror reported only hearing Harrell ask, "why he can't talk," while counsel were at the side-

bar conference.  (*Id.*, at 489.)  A few of the other jurors reported that they heard Harrell talking

or mumbling, but could not make out what he was saying, and the rest reported that they

overheard nothing at all.  (*See id.*, at 487-504.)[26]  Each of the jurors individually confirmed that,

despite Harrell's conduct, he or she could fair and remain impartial.  (*See id.*, at 481-504.)

On this record, there is no basis for this Court to find that the Appellate Division's

rejection of Petitioner's claim that he was denied due process as a result of Harrell's outbursts

was contrary to, or an unreasonable application of federal law.  *See* 28 U.S.C. § 2254(d).  Not

only did the trial court take appropriate steps to protect the integrity of Petitioner's trial, but, in

its efforts to ensure that the trial was fair, the court uncovered nothing that suggested that the jury

either heard or saw anything during Harrell's outbursts that could have fundamentally tainted the

proceedings.

For all of the above reasons, I recommend that Petitioner's first stated ground for habeas

relief be dismissed in its entirety.

### 2. Ground Two:  Due Process Claims Arising From the Introduction of Evidence of Petitioner's Uncharged Prior Bad Acts and the Prosecutor's Comments Regarding the Victim

In his second stated ground for habeas relief, Petitioner again asserts that he was denied

due process at trial, this time because the trial court (a) failed to grant a mistrial after Harrell

---

[26] The only other jurors who reported hearing or seeing anything were alternate jurors, who did not eventually participate in the deliberations; one of the alternate jurors reported hearing Harrell ask "why should he have to shut his mouth," and another reported seeing him make a facial gesture.  (*See* Trial Tr., at 481-87.)

testified to Petitioner's and his co-defendant's prior bad acts, and (b) failed to allow defense counsel to introduce evidence of Johnson's bad character (including, according to Petitioner, evidence of Johnson's "[p]rior murder charge and the violent expressions contained in his rap music"), after the prosecutor allegedly created an misimpression of Johnson's good character. (Pet. ¶ 13 (Ground Two); *see also* Reno Decl., Ex. 1, at 45-53.)  These two claims are addressed separately below.

**a.      Alleged Improper Testimony
<u>Regarding Uncharged Prior Bad Acts</u>**

The "prior uncharged bad acts" evidence at issue on Petitioner's first of these two claims was Harrell's testimony that, at the time of Harrell's fight with Petitioner on the night of the shooting, Petitioner was "dusted," *i.e.*, on drugs (*see* Trial Tr., at 465 ("I had a fight with [Petitioner] because he tried to come at me because he was dusted")), and Harrell's further testimony that, on that same night, Elvis made threats to Johnson by telephone (*see id.*, at 466 ("I proceeded upstairs to [Johnson's] apartment," and "[m]oments later he was getting threats by Elvis on the phone")).  (*See* Reno Decl., Ex 1, at 45.)

On his direct appeal, Petitioner raised his claim regarding the introduction of this evidence in federal, due-process terms.  (*See* Reno Decl., Ex.1, at 45-49 (citing both state and federal law).)  As to both portions of Harrell's testimony, the Appellate Division held that Petitioner's due-process claim was unpreserved, and the Appellate Division declined to review both portions of the claim in the interests of justice.  *See Silvestre*, 988 N.Y.S.2d at 171.  The court also found that the claim was without merit:

> The testimony that [Petitioner] was "dusted' at the time of the accident [sic] cannot be said to have been prejudicial, since there is no basis to conclude that the jury understood this to be a drug reference, and since the court sustained a general objection to the testimony.

57

> We similarly reject [Petitioner's] position that his trial was
> corrupted by Harrell's description of a threat allegedly made by
> [Petitioner's] codefendant toward the decedent . . . .  [The claim
> was not preserved, and,] [i]n any event, the court instructed the
> jury to disregard the testimony concerning a threat.

*Id.*  Petitioner then fully exhausted the claim, by raising it again, in federal terms, in his letter seeking leave to appeal to the Court of Appeals.  (*See* Reno Decl., Ex. 4, at 13.)

The Appellate Division's ruling that this claim – with respect to Harrell's testimony about both Petitioner and Elvis – was unpreserved was clear from the face of its decision, and constituted an adequate application of the state's preservation requirement.  As is evident from the trial transcript, Petitioner's counsel made only a general objection to Harrell's testimony regarding Petitioner being "dusted," which the trial court sustained.  (Trial Tr., at 465.)  Absent any further protest, the issue was not preserved for appeal, under state law.  *See Harris v. Woods*, No. 05cv5582 (PAC) (AJP), 2006 WL 1140888, at *35 (S.D.N.Y. May 1, 2006), *report and recommendation adopted*, 2006 WL 1975990 (July 10, 2006).  Similarly, as to Harrell's testimony regarding Elvis's supposed threats, Petitioner's counsel again made only a general objection (*see* Trial Tr., at 466), and, when Elvis's moved for a mistrial (*see id.*, at 470-71), Petitioner's counsel did not join in that motion (*see id.*).  On this record, Petitioner's claim is procedurally barred from habeas review, and, as with his similarly barred claims, he has not shown any basis for overcoming the bar.

In any event, this claim, too, would be subject to dismissal on the merits, even if it were not barred or if Petitioner could somehow overcome the bar.  Given that the Appellate Division provided an alternate holding that rejected Petitioner's claim on the merits, if this Court were to reach the claim, it would need to review it under AEDPA's deferential standard.  Under that standard, Petitioner could only obtain habeas relief if the Appellate Division's decision was

contrary to, or constituted an unreasonable application of federal law, as clearly established by the holdings of the Supreme Court. *See* 28 U.S.C. §2254(d); *see also, e.g.*, *Carey v. Musladin*, 549 U.S. 70, 76 (2006). As Respondent points out, the Supreme Court has not directly addressed the question of whether the admission, at trial, of evidence of uncharged crimes can constitute a constitutional, due-process violation. (*See* Resp. Mem., at 41 (quoting *Jones v. Conway*, 442 F. Supp. 2d 113, 131 (S.D.N.Y. 2006) ("As a threshold matter, the issue of whether an admission of uncharged crimes can ever constitute a violation of the Due Process Clause has not been decided by the Supreme Court" (citing *McGuire*, 502 U.S. at 75 n.5 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."))).) Accordingly, even if the trial court had improperly admitted the identified evidence of the prior uncharged bad acts, Petitioner would be unable to demonstrate that the court's holding unreasonably applied Supreme Court law.

Moreover, the evidence in question was not even *admitted* by the trial court in this case, but rather was *excluded*. As noted above, the trial court sustained Petitioner's counsel's objection to Harrell's testimony regarding Petitioner's being "dusted." (Trial Tr., at 465.) Before that testimony was given, the trial court had explicitly instructed the jury to disregard any answer as to which an objection was sustained. (*See id.*, at 14 ("If I sustain the objection, that means that I believe the question or the answer is in some way improper. Therefore any answer to an objectionable question must be stricken and may not be considered by you for any purpose.").) Further, after the prosecutor agreed to withdraw the question that had led to Harrell's testimony regarding the threats against Johnson, the trial court struck that question and Harrell's answer, and specifically instructed the jury to disregard them (*id.*, at 474, 480.) As a

jury is presumed follow a trial court's instructions to disregard inadmissible evidence, *see Miller*, 483 U.S. at 767 n.8, and as there are no exceptional circumstances here to suggest that the jury could not have followed the court's instructions in this instance, Petitioner has not shown any reasonable basis for concluding that Harrell's testimony about the co-defendants' prior bad acts fundamentally tainted the trial.

Accordingly, to the extent Petitioner has asserted a due-process claim based on Harrell's testimony regarding the co-defendants' prior bad acts, the claim should be dismissed as procedurally barred and, in any event, without merit.

> **b.     The Court's Denial of Leave to the Defense
> To Correct the Alleged Misimpression of
> the Victim Created by the Prosecutor's Remarks**

In the additional claim raised as part of his second-stated ground for habeas relief, Petitioner asserts that the prosecutor, in his opening statement, "characterized Johnson as a young father and aspiring artist with everything to live for" (Reno Decl., Ex. 1, at 50), opening the door for the defense to introduce evidence that Johnson was not actually a person of good character (*see id.*, at 50-53; Pet. ¶ 13 (Ground Two)).  By denying defense counsel's request to introduce evidence that Johnson had previously been arrested for murder and that his rap music purportedly "glamorized violence, drug use, and his prior homicides" (Reno Decl., Ex.1, at 50), the trial court, according to Petitioner, erroneously allowed a misleading portrait of the victim to stand uncorrected, and thereby violated Petitioner's due-process rights *(see id.*).

Petitioner raised this claim, based on both the federal and state constitutions, in his brief on appeal to the Appellate Division.  (*See id.*)  Relying on state law, the Appellate Division denied the claim, stating:

> We . . . reject [Petitioner's] claim that he should have been
> permitted to introduce evidence that the decedent had been
> suspected of murder and had written rap songs which boasted of
> violent acts, including homicide.  The statements made by the
> prosecutor which such evidence would have been designed to
> counter were not intended to vouch for the decedent's good
> character.

*Silvestre*, 988 N.Y.S.2d at 171 (citing *People v. Ruine*, 258 A.D.2d 278, 279 (1st Dep't 1999),

*leave to appeal denied*, 93 N.Y.2d 929 (1999)).  In his letter seeking leave to appeal to the

Appellate Division, Petitioner then raised the claim again – again citing both federal and state

law in support.  (Reno Decl., Ex. 4, at 13.)

As Petitioner raised the claim at all necessary levels in terms sufficient to apprise the

state courts of the federal nature of the claim, the claim is fully exhausted.  The Appellate

Division, however, appears to have relied on state law to deny the claim, seemingly creating a

procedural bar to this Court's review of the claim.  Yet, even if the claim could still be reviewed

by this Court, Petitioner would not be able to prevail on his federal claim, as he has not shown

that the trial court's evidentiary ruling was erroneous, much less so egregiously so that it violated

due process.

In his appellate brief, Petitioner set out the state evidentiary rule that the trial court

allegedly misapplied.  Under New York law, evidence of the character of the deceased victim is

generally inadmissible in a homicide trial, unless the defendant is asserting a defense that he or

she was justified in killing the victim, or acted in self-defense.  (*See* Reno Decl., Ex.1, at 51; *see*

*also People v. Flournoy*, 221 N.Y.S.2d 142, 142-143 (1st Dep't 1960) (holding that, where a

defendant claims self-defense, then the character of the deceased may be proven).  The

prosecution, however, may "open the door" to allowing such evidence to be introduced, by

taking advantage of the rule of preclusion in order to mislead the jury.  (*See* Reno Decl., Ex. 1, at

50-51 (citing *People v. Rojas*, 97 N.Y.2d 32, 38-39 (2001).)  Thus, where a prosecutor vouches

for the good character of the deceased, the defendant "'may seek to admit the excluded evidence

to clarify and fully elicit the [issue] that has been only partially exposed.'"  (*Id.*, at 51 (quoting

*People v. Mateo*, 2 N.Y.3d 383, 425 (2004)).)  As Respondent notes, state law then leaves it to

the trial court to determine, in its discretion, "'whether and to what extent, the evidence or

argument said to open the door is incomplete and misleading, and what if any otherwise

inadmissible evidence is reasonably necessary to correct the misleading impression.'"  (Resp.

Mem., at 54 (quoting *People v. Massie*, 2 N.Y.3d 179, 184 (2004).)

   In this instance, the factual comments made by the prosecutor in his opening statement –

that Johnson was "an aspiring rapper," that he "had an album coming out," that he "was going to

have an album release party on . . . the day he died," that he "had twins that were born a few

weeks before," and that "[o]ne baby was in the hospital because of premature difficulties and one

was home" with Jones (Trial Tr., at 16-17) – were not disputed.  The only "characterization" of

those facts that seems to have been faulted by Petitioner was the prosecutor's added comment

that Johnson "had everything to live for."  (*Id.*, at 17.)

   On the question of whether the prosecutor's remarks had "opened the door" to the

introduction of evidence as to Johnson's character, the court heard lengthy argument from

Elvis's counsel (who was the one who raised and pressed the point, with Petitioner's counsel

merely "join[ing] the application" (*see id.*, at 33)), noted that defense counsel had not raised any

contemporaneous objection when the prosecutor's statements were made (*id.*, at 30), confirmed

that Elvis was not asserting a justification defense (*id.*), noted that the law was "quite clear" that

a defendant was not permitted to "make an argument to the jury that a decedent was less worthy

of living than anybody else" (*id.*, at 26), and observed that the use of "some rhetoric to set the

62

scene for the jury" was "relatively typical [for an] opening in a homicide case" (*id.*, at 30).  The court also noted that, in a homicide case, the prosecution "can bring out the parameters of [the deceased's] family situation, without "opening the door to any kind of character assassination." (*Id.*, at 33.)  At bottom, the court determined that the prosecutor's remarks had not opened the door to the defendants' introduction of evidence of Johnson's purported involvement in homicides and/or his rap lyrics that may have been suggestive of such involvement.  (*See generally id.*, at 25-34; *see also id.*, at 30 ("I don't see that this opens the doors to what would be clearly totally inadmissible, absent [a self-defense claim]").)  As to the rap lyrics, the court also emphasized that it considered such lyrics, in any event, "equivalent to [] work[s] of fiction," that could not be considered for their "truth."  (*Id.*, at 29-31.)  Nonetheless, the court considered defense counsel's seeming concern that the prosecution was "making a play for sympathy for the deceased," and cautioned the prosecutor to ask any questions about Johnson's career and family "very quickly and only in a very factual manner."  (*Id.*, at 32.)  The court also permitted defense counsel to inquire of Jones as to whether she was aware of drugs found in the mailbox for the apartment she shared with Johnson.  (*See id.*, at 3-8; *see also id.*, at 86.)

Petitioner has not challenged the state evidentiary law at issue here as unconstitutional, and, on this record, Petitioner has not demonstrated that the trial court misapplied that law in precluding evidence of Johnson's supposedly bad character.  To the contrary, the record reflects that the court made its evidentiary ruling in a reasoned exercise of its discretion, and in accordance with well-established, state-law evidentiary principles.  The record similarly reflects a sound basis for the Appellate Division's determination that the prosecutor's statements – which were primarily factual in nature – did not sufficiently "vouch for the decedent's good character" so as to open the door to the introduction of evidence that Johnson had been "suspected of

murder and had written rap songs which boasted of violent acts." *Silvestre*, 988 N.Y.S.2d at 171.

Certainly, nothing in the record regarding the trial court's ruling on this point suggests that it

issued an evidentiary ruling that was not only erroneous under state law, but so prejudicial to

Petitioner's defense that it rendered his trial fundamentally unfair, so as to deprive him of

constitutional due process. *See Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) ("Erroneous

[state court] evidentiary rulings do not automatically rise to the level of constitutional error

sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue *only*

where petitioner can show that the error deprived her of a *fundamentally* fair trial." (emphasis in

original)), *cert. denied*, 464 U.S. 1000 (1983); *see also Kanani v. Phillips*, No. 03cv2534

(PKCAJP), 2004 WL 2296128, at *15 (S.D.N.Y. Oct. 13, 2004) ("[A] habeas petitioner must

demonstrate that the allegedly-erroneous state court evidentiary rulings violated an identifiable

constitutional right . . . [and] [t]hat is a heavy burden, for generally, rulings by state trial courts

on evidentiary issues, even if erroneous, do not rise to the level of a constitutional violation"

(internal quotation marks and citation omitted)), *report and recommendation adopted*, 2005 WL

2431416 (Oct. 3, 2005). This claim should therefore be dismissed.

>   **3.     Ground Three:  Claim That the Trial Court Failed
>           To Exercise Its Discretion as to Whether an Indicted
>           <u>Misdemeanor Charge Should Have Been Presented to the Jury</u>**

Petitioner's third ground for habeas relief relies on the trial court's error under *Extale*. In

Petitioner's case, the trial court expressed an understanding that the prosecution had the authority

to dismiss one of the indicted charges against Petitioner (specifically, a misdemeanor charge for

fourth degree criminal possession of a weapon, specifically, a knife), over Petitioner's objection,

prior to submission of the case to the jury. (*See* Trial Tr., at 1029-30 (trial court stating, "That's

my understanding, the People can dismiss [one of the counts of the indictment] at any time prior

to submission unless it could be supported as a lesser included offense").)  In *Extale*, the trial court had expressed the same type of understanding.  *See* 18 N.Y.3d at 693 (quoting trial court as having stated, "I believe you [the People] have the authority, if you wish, to withdraw the second count of the indictment").  Recognizing that "a defendant, not optimistic about the likelihood of acquittal, [may] want[] the jury to have a chance to compromise or exercise mercy by convicting him of a lesser crime," *id.*, and tracing through nearly two centuries of New York common-law and statutory history, *id.* at 694-95, the New York Court of Appeals reversed Extale's conviction, holding that, under current state law, the discretion to dismiss an indicted charge lies with the trial court, *not* with the prosecution, and that it was error for the court to have failed to exercise that discretion, *id.* at 696.  On Petitioner's direct appeal, the Appellate Division acknowledged that the trial court had similarly failed to exercise its discretion, and therefore found that the trial court had erred, *Silvestre*, 988 N.Y.S.2d at 169-70, although the Appellate Division then went on to find that the error was harmless, *id*. at 170.

The issue here is not whether the Appellate Division committed error under *Extale*; the Appellate Division found that it did, and that is not now in dispute.  Nor is the issue for this Court whether the Appellate Division engaged in a proper harmless-error analysis, which Petitioner challenged in his letter seeking leave to appeal to the Court of Appeals.  Rather, the threshold issue here is whether Petitioner has raised a cognizable federal claim, and this Court concludes that he has not.

In his brief to the Appellate Division, Petitioner argued this claim purely in state-law terms, under *Extale* – which itself decided a question of state law.  (*See* Reno Decl., Ex. 1, at 54-56; *see generally Extale*, 18 N.Y.3d 690.)  Then, in his letter seeking leave to appeal to the Court of Appeals, Petitioner argued only that, under New York precedent, the Appellate Division

should be found to have employed an inappropriate harmless-error standard in reviewing a trial

court's *Extale* error.  (*See* Reno Decl., Ex. 4, at 11-12.)  At no point did Petitioner ever suggest to

the state courts that the *Extale* error violated his federal due-process rights, such that he could

have been understood to have been raising a federal constitutional claim.  Likewise, the Petition

here cannot plausibly be read to assert a federal claim based on the *Extale* error.[27]  "In

conducting habeas review, a federal court is limited to deciding whether a conviction violated the

Constitution, laws, or treaties of the United States."  *McGuire*, 502 U.S. at 68 (citations omitted).

A purely state-law claim is not cognizable on federal habeas review.  *See id.*

    In any event, even if the Petition were somehow construed to raise a federal, due-process

claim arising out of the trial court's *Extale* error, and even if that claim could be found to have

been exhausted (or if Petitioner could overcome to the procedural bar arising from his failure to

exhaust the claim), the record could not support a constitutional violation.  Respondent argues

that, if this claim "presented an issue of constitutional concern," then any constitutional error

would have been harmless.  (Resp. Mem., at 11-12.)  This Court, however, finds no need to

engage in harmless-error analysis on this point, as the *Extale* error committed by the trial court

simply cannot be said to have risen to the level of constitutional error.  There is no federal law

---

[27] Although, in his reply, Petitioner now argues that *Extale* "implies that [P]etitioner was deprived of his Fourteenth Amendment right to due process and equal protection of the laws" (Pet. Reply ¶ 7), a habeas petitioner may not raise a federal claim for the first time on reply.  *See* Rule 2(c)(1) of the Rules Governing Section 2254 Cases in the United States District Courts (stating that a habeas petition "must . . . specify all grounds for relief available to the petitioner"); *see also Ennis v. Artus*, No. 09cv10157, 2011 WL 3585954, at *19 (S.D.N.Y. Aug. 12, 2011) (collecting cases holding that, under this Rule, only claims raised in a Section 2254 petition itself are appropriately considered in a habeas proceeding, and that claims raised solely in the petitioner's reply should not be reviewed), *report and recommendation adopted*, 2012 WL 3957046 (Sept. 10, 2012).  In any event, given the way Petitioner presented the claim to the state courts, any federal claim that he may now be seeking to raise would be unexhausted, deemed exhausted, and procedurally barred.

suggesting that Petitioner had the right to have the misdemeanor charge at issue presented to the

jury, and, indeed, even the New York Court of Appeals made clear, in *Extale*, that, in the

exercise of its discretion, a trial court may opt to dismiss an indicted charge, at the prosecution's

request.  *See Extale*, 18 N.Y.3d at 695.  In these circumstances, the fact that the misdemeanor

weapon-possession charge was not submitted to the jury cannot be said to have rendered

Petitioner's trial fundamentally unfair.

For this reason, Petitioner has not stated a federally cognizable claim based on the trial

court's *Extale* error, and any claim relating to that error should be dismissed.

### 4.      Ground Four:  Claim That Petitioner's Sentence Was Excessive

Petitioner's fourth stated ground for habeas relief is that his sentence of 25 years was

"harsh and excessive where [he] ha[d] a minimal prior record," and where, "given the absence of

other aggravating factors," the sentence, in his view, "appear[ed] to reflect punishment for the

counts that [he] was acquitted of."  (Pet. ¶ 13 (Ground Four).)  For the reasons stated below, this

claim is not cognizable in this proceeding.

First, in his habeas Petition, Petitioner cites no federal law in support of his excessive-

sentence claim (*see* Pet. ¶ 13), nor did he refer to any federal law in the state-court briefs or the

letter seeking leave to appeal to the Court of Appeals, on which his Petition purportedly relies

(*see id.*; *see generally* Reno Decl, Exs. 1, 3, and 4).  To the extent Petitioner's claim is grounded

in state law, it cannot be considered on federal habeas review.  *See McGuire*, 502 U.S. at 68; *see

also Bell v. Ercole*, 631 F. Supp. 2d 406, 418 (S.D.N.Y. 2009) ("[Petitioner] contends that his

sentence of fourteen years of imprisonment was excessive and should be reduced in the interest

of justice.  To the extent that this claim relies on state law principles, it is not cognizable on

federal habeas review.").

Second, to the extent Petitioner now argues, on reply, that his Petition and the state briefs on which it relies were was intended to assert a federal excessive-sentence claim, this Court finds his arguments unpersuasive.  Although Petitioner now contends that "the language of [his] state court argument challenging his sentence invoke[d] Sixth, Eighth and Fourteenth Amendment review" (Pet. Reply, at 5), adding, "[w]hat else could his argument have possibly meant?" (*id.*), the fact remains that his brief to the Appellate Division expressly cited the state (and *not* the federal) constitution, and specifically relied on state judicial precedent (*see* Reno Decl, Ex. 1, at 57-62; Ex. 3, at 27-30; Ex. 4, at 13-14).  Moreover, nothing in the Appellate Division's decision indicates that the court understood Petitioner to have asserted a federal claim.  *See Silvestre*, 988 N.Y.3d at 172 (stating only that the court "perceive[d] no basis for reducing the sentence").  Accordingly, Petitioner is either attempting to raise a federal claim for the first time on reply, which he may not do (*see supra*, at n.27), or, if his Petition were somehow construed to raise a federal excessive-sentence claim, then that claim must be found unexhausted, deemed exhausted, and procedurally barred.[28]

Third, in order to state a federally cognizable excessive-sentence claim, a habeas petitioner must generally allege that the statute under which he was sentenced was *itself*

---

[28] Petitioner's statement, in his reply, that "[t]he double jeopardy and due process standards of the state are similar to its federal counterpart" (Pet. Reply, at 5), is insufficient to demonstrate exhaustion of a federal claim.  While there may be rare instances in which state and federal claims are so nearly identical that raising the state claim on appeal may be found to have exhausted the federal claim, *see Jackson v. Edwards*, 404 F.3d 612 (2d Cir. 2005), even closely analogous state and federal claims have generally been held to be distinct, for exhaustion purposes, *see, e.g.*, *Baldwin*, 541 U.S. 27 (claim of ineffective assistance of appellate counsel was unexhausted where it was not presented to the state courts as a federal claim).  In this instance, as discussed further herein, the state excessive-sentence claim that Petitioner asserted on his direct appeal is actually distinct from only federal constitutional claims that Petitioner could have asserted with regard to his sentence.

unconstitutional, under the Eighth Amendment.  *See United States v. Dawson*, 400 F.2d 194, 200 (2d Cir. 1968) ("when a statute provides for punishment thought to be violative of the [Eighth] [A]mendment the constitutionality of the statute itself must be attacked" (citations omitted)). Here, Petitioner has certainly made no such attack on the validity of the relevant statute.

Finally, in the absence of a challenge to the relevant statute itself, a federal excessive-sentence claim may only be maintained if the sentence imposed fails to comply with state law. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." (citation omitted)). A sentence that is within the range permitted by state law may not be held to be disproportionate under the Eighth Amendment.  *Pinero v. Grenier*, 519 F. Supp. 2d 360, 371 (S.D.N.Y. 2007).

In this case, Petitioner was convicted of Manslaughter in the First Degree, in violation of N.Y. Penal Law § 125.20(1) (*see* Pet. ¶ 4), a Class B violent felony, *see* N.Y. Penal Law § 70.02(1)(a).  Further, at Petitioner's sentencing for that 2006 crime, the court found Petitioner to be a second felony offender, based on his February 1998 conviction of a predicate non-violent felony, Attempted Sale of a Controlled Substance in the Third Degree – a conviction for which he was reportedly sentenced on January 19, 2001.  (*See* Sentencing Trial Tr., at 2, 12-18.)  In light of his predicate non-violent felony conviction, the provision of state law that dictated the applicable range for a prison term in his case was N.Y. Penal Law § 70.06(6)(a).  *See* N.Y. Penal Law § 60.05(6) ("When the court imposes sentence upon . . . a second felony offender, as defined in section 70.06, the court must impose a sentence of imprisonment in accordance with section . . . 70.06."); *see also id.* § 70.06(1)(b)(iv) (defining "second felony offender" to include a person with a predicate felony conviction for which sentence was imposed "not more than ten years before commission of the felony of which the defendant presently stands convicted").  As a

second felony offender convicted of a Class B violent felony, Petitioner was subject, under N.Y. Penal Law § 70.06(6)(a), to being sentenced to a determinate sentence of "at least eight years" and "not exceed[ing] twenty-five years." The 25-year term of imprisonment that the sentencing court imposed, while at the upper end of this permissible range, was not outside the range, and thus was authorized by the New York sentencing statute.[29]

Accordingly, Petitioner's excessive-sentence claim cannot be reviewed in this habeas proceeding.

### 5.    Ground Five:  Claim of Actual Innocence

As his final stated ground for habeas relief, Petitioner claims that he is "actually, factually and/or legally innocent of and for the crime he was convicted for."  (Pet. ¶ 13 (Ground Five).)  In support of this claim, Petitioner again describes the inconsistencies in Harrell's testimony, argues that Harrell "lied" at trial and that his testimony "contradicted the physical evidence and medical expert," and contends that there was "no reliable evidence presented to support the charge of manslaughter in the first degree."  (*Id.*)  To the extent this claim is intended to assert Petitioner's "legal" innocence, it is identical to Petitioner's claim, discussed above, that the evidence presented at trial was legally insufficient to support the verdict.  (*See* Discussion, *supra*, at Section II(B)(1)(a).)  Therefore, this Court will only here address Petitioner's additional claim that he is "actually" (or "factually," which this Court takes to mean the same thing) innocent of manslaughter.  Even assuming that a free-standing claim of actual innocence could be cognizable

---

[29] Further, even if Petitioner was not properly adjudicated a second felony offender (*see* Background, *supra*, at Section B(2)), his sentence would still have fallen within the permissible range for first degree manslaughter.  *See* N.Y. Penal Law § 70.02(3)(a) (authorizing a determinate prison sentence of at least five years and not exceeding 25 years for a class B felony).

in this proceeding – a question that the Supreme Court has not, to date, resolved – this claim should be dismissed for lack of merit.

In addressing Petitioner's actual-innocence claim, Respondent first notes that Petitioner never raised such a claim on his direct appeal, and that the claim is therefore unexhausted.  (*See* Resp. Mem., at 16-17.)  Respondent then further points out that, as (a) Petitioner's claim is not based on any new evidence of his purported innocence, but rather is based entirely on a challenge to the evidence presented to the jury at trial, and (b) the Appellate Division already addressed the inconsistencies in Harrell's testimony and determined that they did "not provide a basis for disturbing the jury's determination," *Silvestre*, 988 N.Y.S 2d at 170, Petitioner would not now have a basis for seeking collateral review of his conviction, pursuant to any even potentially applicable provision of Section 440.10 of the New York Criminal Procedure Law (*see* Resp. Mem., at 17-18 (discussing limitations of Section 440.10 proceedings)).  Respondent thus contends that the claim should be deemed exhausted and be found to be procedurally barred.  (*Id.*, at 18.)

Regardless, though, Petitioner simply cannot make out an actual-innocence claim on the evidence presented.  As set out above (*see* Discussion, *supra*, at Section I(C)), the Supreme Court has held that, so as to avoid a "fundamental miscarriage of justice," a federal habeas court may review a procedurally defaulted claim, where the petitioner presents sufficient new evidence of actual innocence.  *Schlup*, 513 U.S. at 324.  The Supreme Court has similarly held that a habeas claim brought outside the applicable statute of limitations may nonetheless be reviewed, where a credible showing of actual innocence is made.  *McQuiggin v. Perkins*, 569 U.S. 383 (2013).  The Supreme Court, however, has not ruled that "actual innocence," in addition to serving as a gate opener for the habeas court's review of otherwise procedurally barred claims,

may stand alone as a cognizable habeas claim.  *See id.* at 391 ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." (citations omitted)).

One thing the Supreme Court *has* made clear is that, were such a freestanding claim to exist, the standard to establish such a claim would be "extraordinarily high."  *Herrera v. Collins*, 506 U.S. 390, 417 (1993); *House v. Bell*, 547 U.S. 518, 555 (2006) (citing *Herrera*).  In *House*, the petitioner came forward with new DNA evidence and other forensic evidence in his favor, together with evidence that another potential suspect had confessed to the crime.  *See House*, 547 U.S. at 540-53.  Despite this substantial, exculpatory new evidence, and the fact that the Supreme Court found that House had "cast considerable doubt on his guilt," *id.* at 554, the Court wrote that, "whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it," *id.* at 555.  Here, in comparison, Petitioner has offered *nothing* to demonstrate that this is the type of truly extraordinary case that might justify relief based on actual innocence alone.  In support of his claim of innocence, Petitioner has offered only the same conflicting testimony of Harrell that the jury heard and that Petitioner's counsel dissected for the jury, in detail, in summation.  As already noted, evaluating a witness's credibility is within the province of the jury, and Petitioner cannot – in the guise of an "actual innocence" claim – ask this Court to undermine that critical jury function.

Accordingly, I recommend that the Court dismiss Petitioner's actual-innocence claim as without merit.

## CONCLUSION

For all of the foregoing reasons, I recommend that the Petition for a writ of habeas corpus be dismissed in its entirety.  Further, I recommend that the Court decline to issue a certificate of

appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Katherine Polk Failla, United States Courthouse, 40 Centre Street, Room 2103, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Failla.  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECULDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

If Petitioner does not have access to cases cited herein that are reported only on Westlaw or LEXIS/NEXIS, he may request copies from Respondent's counsel.  *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other

authorities that are unpublished or reported exclusively on computerized databases that are] cited

in a decision of the Court and were not previously cited by any party").

Dated: New York, New York
June 25, 2018

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. Katherine Polk Failla

Mr. Roger Silvestre
10-A-0614
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562

Respondent's counsel (via ECF)

74